IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


R.R. FREDEKING, II,                )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )       1:20-cv-612
                                   )
TRIAD AVIATION, INC.,              )
H&H PROPELLER SERVICE, INC.,       )
and AIRCRAFT ACCESSORIES OF        )
OKLAHOMA, INC.                     )
                                   )
        Defendants.                )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is Triad Aviation, Inc.'s and H&H
Propeller Service, Inc.'s (collectively "Defendants") Motion for
Sanctions. (Doc. 39.) Defendants allege that Plaintiff, R.R.
Fredeking, II, denied Defendants access to the aircraft that is
the subject of this dispute and disposed of the aircraft's
engine, ultimately preventing Defendants from testing or
inspecting the engine. (See Defs.' Mem. of Law in Supp. of
Defs.' Triad Aviation, Inc. and H&H Propeller Service, Inc.'s
Mot. for Sanctions ("Defs. Br.") (Doc. 40) at 1.)[1] Defendants

------------------------------------

    [1] All citations in this Memorandum Opinion and Order to
documents filed with this court refer to the page numbers
located at the bottom right-hand corner of the documents as they
appear on CM/ECF.

allege that Plaintiff's actions resulted in spoliation of key evidence, and they request this court dismiss this action or provide other relief as warranted. (See id. at 1-2.) For the reasons provided herein, this court finds that sanctions are appropriate. This court will grant Defendants' motion in part as to an adverse inference instruction. Defendants' motion will be denied to the extent that it requests dismissal of the action.

I.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This dispute centers around a possible aircraft failure due to an overspeed event allegedly caused by Defendants' repair work. The record evidence in the light most favorable to Plaintiff, the non-moving party, is as follows.

Plaintiff R.R. Fredeking, II is a West Virginia resident. (See First Am. Compl. (Doc. 15) at 1.) Defendants Triad Aviation, Inc. and H&H Propeller Service, Inc. are North Carolina corporations with their principal places of business in North Carolina. (See id.; see Answer of Defs. Triad Aviation, Inc. and H&H Propeller Service, Inc. ("Defs.' Answer") (Doc. 17) at 1.)

A.  **Plaintiff's Service Work**

Plaintiff "owns a Piper Malibu N567KC, a single engine aircraft powered by a Continental TISIO 550c engine using a variable pitch Hartzell propeller." (First Am. Compl. (Doc. 15)

- 2 -

at 3.) Plaintiff contacted Defendant Triad Aviation to perform service work on his plane. (See Doc. 34-2.) Following email discussion and receiving estimates, Plaintiff authorized Defendants to conduct engine and propeller overhauls for his plane, and he delivered the plane to Defendants. (See First Am. Compl. (Doc. 15) at 4-5; see Defs.' Answer (Doc. 17) at 14-17.) After Defendants completed the agreed-upon repairs, (see Ex. 13, Engine, Aircraft, and Propeller Logbook Entries (Doc. 34-13)), Plaintiff picked up the plane from Defendants' facility in North Carolina, (see Ex. 1, Fredeking Depo. ("Defs.' Excerpts of Pl.'s Dep.") (Doc. 34-1) at 5).

Plaintiff alleges that during his flight from North Carolina to his home in West Virginia, the plane experienced three propellor overspeed events. (See Ex. 1, Fredeking Depo ("Defs.' Second Excerpts of Pl.'s Dep.") (Doc. 38-1) at 2-4.) Plaintiff alleges that due to the overspeed events, his plane was no longer airworthy, requiring the engine and propellor to be removed and overhauled. (See First Am. Compl. (Doc. 15) at 6-7.) Plaintiff claims that Defendants failed to properly complete the service work on Plaintiff's plane, which caused the overspeed events. (See First Am. Compl. (Doc. 15) at 8.)

On August 15, 2019, Plaintiff mailed Defendants a letter raising his concerns about Defendants' service and the overspeed

- 3 -

events. (See Ex. A, Pl.'s Depo. ("Pl.'s Excerpts of Pl.'s Dep.") (Doc. 42) at 33.) However, Plaintiff alleges that Defendants were not willing to repair the plane in West Virginia; instead, they demanded he send the engine or plane back to Defendants' facility in North Carolina, which Plaintiff was not able to do. (See id. at 5; see Ex. D ("Pl.'s Excerpts of Richard Diamond Dep.") (Doc. 44) at 11.)

A few days after the overspeed events, Plaintiff ordered a new engine, (see Ex. 16, Aug. 22, 2019, Purchase Order (Doc. 34-16) at 1), and a new propellor, (see Ex. 17, Oct. 2, 2019, Purchase Order (Doc. 34-17) at 1), from their respective manufacturers to replace the allegedly faulty engine and propellor Defendants had serviced and installed.

On October 25, 2019, Plaintiff filed his first complaint in the United States District Court for the Southern District of West Virginia. See Compl., Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 1. The West Virginia complaint has since been dismissed, leading to the present case before this court. See Mem. Op. and Order, Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 11 (granting Defendants' motion to dismiss for lack of personal jurisdiction). Because some of the relevant events occurred following the initial filing in the Southern

- 4 -

District of West Virginia, this background section will first address those events before discussing the filing of this case in the Middle District of North Carolina. See infra Part I.E.

## B. Difficulties Scheduling the Plane Inspection

On October 31, 2019—six days after filing the West Virginia complaint—Plaintiff's counsel sent a letter to Defendants, "provid[ing] [Defendants] 20 days from the date of this letter to conduct" an inspection of the plane "prior to the replacement of [its] engine and prop[sic]." (See Ex. 18, Oct. 31, 2019 Letter from B. Mundy to B. Ware (Doc. 34-18) at 1.) Between November 2019 and February 2020, when the plane's engine was replaced, (see generally Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up on Inspection (Doc. 34-24) at 1–2), Defendants' counsel repeatedly requested an opportunity to inspect the plane, to no avail.

On November 19, 2019, the day Defendants' counsel was retained on the matter, they emailed Plaintiff's counsel requesting an opportunity to inspect the plane. (See Ex. 1, Nov. 19 Email from B. Ware to B. Mundy (Doc. 48-1) at 1.) On November 21, 2019, Defendants' counsel emailed Plaintiff's counsel to follow-up on scheduling an inspection of the plane. (See Ex. 19, Nov. 21, 2019 Email from B. Ware to B. Mundy requesting inspection details (Doc. 34-19) at 1.) On December

- 5 -

13, 2019, Defendants' counsel emailed Plaintiff's counsel again, this time requesting information on when Plaintiff was proceeding with the engine replacement to coordinate an inspection of the plane beforehand. (See Ex. 20, Dec.-Jan. Emails (Doc. 34-20) at 3-4.) On December 20, 2019, Defendants' counsel again emailed Plaintiff's counsel to follow up on the engine replacement details. (See id. at 3 ("[A]t the risk of belaboring the point, wanted to touch base briefly on the inspection issue . . . . As you know, we'd like to inspect the plane and work out a mutually agreeable way to do that.").) On December 23, 2019, Plaintiff's counsel responded to say that the new engine would be delivered by the manufacturer on January 14, 2020. (See id. at 2.) In that responsive email, Plaintiff's counsel did not offer a time for the inspection or mention the inspection at all. (See id.)

The next month, on January 6, 2020, Defendants' counsel emailed Plaintiff's counsel to coordinate next steps on the plane inspection. (See id. at 2.) Two days later, on January 8, 2020, Defendants' counsel emailed Plaintiff's counsel to memorialize a voicemail from Plaintiff's counsel suggesting that the engine installation scheduled for January 14 would be delayed. (See id. at 1-2.) Defendants' counsel requested the new date of the plane inspection, explaining that "[t]here [were]

- 6 -

several issues regarding the inspection, parameters, evidence preservation, etc. that" needed to be discussed. (Id.) Later that day, Plaintiff's counsel responded, saying that the new engine's delivery was again delayed from the manufacturer until February 28. (See id. at 1.) Plaintiff's counsel emphasized:

> With respect to my offer to allow your people to be present to view the plane and the removal of the existing engine/properaller[sic] and replacement with the new engine. You should not think of that event as an "inspection." I am only willing to allow your clients to be present to observe. I will not permit your client to interfere with the work that will being[sic] performed on the plane or to speak to the mechanics performing the work. I'm also not interested in engaging in a long dialogue regarding the "parameters" issues set out in your email.

(Id. (cleaned up) (emphasis in original).)

At this point, on January 20, 2020, Defendants' counsel sent a letter to Plaintiff's counsel documenting his attempts to schedule an inspection of Plaintiff's plane prior to the allegedly faulty engine being removed. (See Ex. 21, Jan. 20, 2020 Letter from B. Ware to Mundy (Doc. 34-21) at 1–2.) Defendants' counsel emphasized the need to "examine and inspect [Plaintiff's] airplane and all relevant parts before the engine or propeller are removed." (Id. at 2 (emphasis in original).) On February 7, 2020, Defendants' counsel sent a follow-up letter to Plaintiff's counsel; he explained that he had not received a response to his January 20 letter, and he requested an update on

- 7 -

when Defendants could inspect Plaintiff's plane. (Ex. 22, Feb. 7, 2020 Letter from B. Ware to Mundy (Doc. 34-22) at 1.) On February 14, 2020, Defendants' counsel emailed Plaintiff's counsel to confirm that the engine replacement would occur on February 18; they provided a list of tests that would need to be conducted that day, prior to the engine replacement. (See Ex. 23, Feb. Emails from Pruitt to Mundy (Doc. 34-23) at 1.) In particular, Defendants' counsel noted the need to conduct a "transfer collar test." (Id.) Another follow-up email with the same information was sent on February 17, 2020. (See id. at 2.)

C. **February 18 Engine Replacement**

On the day of the engine replacement, with only four days of advance notice, Defendants' expert and several of Defendants' employees traveled to West Virginia to conduct tests on Plaintiff's plane prior to the engine replacement. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up on Inspection (Doc. 34-24) at 1-2.) However, Plaintiff did not allow Defendants to conduct any tests on the plane, including a transfer collar test. (See id. at 2-3.) Defendants' expert, Dennis Handley, was only able to conduct a visual inspection of the plane. (See Ex. 26, Handley Am. Report (Doc. 34-26) at 2-3.)

Plaintiff testified that he did not even know Defendants would be coming to the engine replacement. (See Defs.' Excerpts of Pl.'s Dep. (Doc. 34-1) at 6.)

Defendants allege that because Plaintiff did not permit them to conduct necessary tests on the plane, Defendants lost the opportunity to investigate the causes of the alleged overspeed events that lead to the present case. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up on Inspection (Doc. 34-24) at 3-4.) Defendants further allege that Plaintiff informed them that he "might ship the engine" to its vendors before Defendants are able to bench test it to "preserve relevant evidence." (Id. at 4.)

D.   **Bench Testing Following the Engine Replacement**

On March 13, 2020, after the engine replacement, Defendants' counsel sent a letter to Plaintiff's counsel outlining options to test the plane engine and propeller. (See Ex. 25, Mar. 13, 2020 Letter re Airplane Part Testing (Doc. 34-25) at 1-2.) Although Plaintiff offered to preserve the propellor and propellor governor for future testing, Plaintiff did not offer to preserve the engine. (See Ex. 2, March 24, 2020 Letter to Mundy (Doc. 40-2) at 1.) Instead, Plaintiff offered to sell the engine to Defendants to allow them to conduct any tests they deemed necessary. (See id. at 1-2.) Defendants declined

- 9 -

this offer but still requested to test the engine. (See id.)
Plaintiff further testified that Defendants could have tested
the engine following its removal by purchasing the engine from
him for $28,000, the amount Plaintiff was credited by sending
the old engine back to the manufacturer. (See Defs.' Second
Excerpts of Pl.'s Dep. (Doc. 38-1) at 5.) Plaintiff later sent
the engine to the manufacturer and cannot retrieve it for
inspection now. (See id.)

Ultimately, Defendants were able to bench test the plane
propeller and governor. (See Ex. 29, Texas Aircraft Inspection
Conclusion (Doc. 34-29) at 1.) However, they were not able to
inspect the engine or inspect the intact plane in the conditions
during which the overspeed events allegedly occurred. Based on
this, Defendants bring a motion for sanctions for spoliation of
evidence.

E.   **Filing of this Matter Before the Middle District of
      North Carolina**

On March 27, 2020, the West Virginia complaint was
dismissed for lack of personal jurisdiction, leading to the
present case. See Mem. Op. and Order, Fredeking v. Triad
Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020),
Doc. 11 (granting Defendants' motion to dismiss).

- 10 -

On July 2, 2020, Plaintiff filed a complaint against Defendants in the Middle District of North Carolina, (see Compl. (Doc. 1)), and subsequently filed an amended complaint, (see First Am. Compl. (Doc. 15)). Originally, Plaintiff named as Defendants Triad Aviation, Inc., H&H Propeller Service, Inc., and Aircraft Accessories of Oklahoma, Inc. (See id.) Plaintiff's claims against Aircraft Accessories of Oklahoma were dismissed with prejudice. (See Dec. 16, 2021 Order (Doc. 28).) Plaintiff currently brings three claims against Defendants in this court: (1) breach of the implied warranty of merchantability, (2) negligence, and (3) breach of contract. (See First Am. Compl. (Doc. 15) at 7-9.)

## II. **LEGAL STANDARD**

A district court has an inherent and "well-acknowledged" power to levy sanctions as necessary to manage its docket, to respond to "abusive litigation practices," or to resolve cases expeditiously. See Roadway Exp., Inc. v. Piper, 447 U.S. 752, 764-65 (1980) (citing Link v. Wabash R.R., 370 U.S. 626, 632 (1962)). A court may deem sanctions appropriate to "preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). As such, imposing sanctions for spoliation of evidence is within

- 11 -

the discretion of the trial court. See Turner v. U.S., 736 F.3d 274, 281–82 (4th Cir. 2013).

Spoliation of evidence is "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri, 271 F.3d at 590 (citing West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party should reasonably know that the evidence may be relevant to anticipated litigation." Id. at 591. Thus, there need not be a discovery order for this duty to trigger. See West, 167 F.3d at 779. Further, this duty arises regardless of whether a party owns or controls the evidence at issue. See Silvestri, 271 F.3d at 591. "[S]poliation does not result merely from the 'negligent loss or destruction of evidence.'" Turner, 736 F.3d at 282 (quoting Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)). "Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction. Although the conduct must be intentional, the party seeking sanctions need not prove bad faith." Id.

- 12 -

When fashioning an appropriate sanction, a district court should consider both the conduct of the spoliator and the resulting prejudice from loss or destruction of the evidence to the movant. See Silvestri, 271 F.3d at 593. Dismissal of the action can be an appropriate sanction, even when loss of evidence was inadvertent or negligent, rather than willful, when the spoliation deprives "the defendant [of] the ability to defend the claim." See id. As an alternative to dismissal, an adverse inference on the potential implications of the spoliated evidence may be a sufficient sanction. See Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 449-51 (4th Cir. 2004).

## III. ANALYSIS

Defendants move for sanctions for Plaintiff's failure to preserve the plane engine. (Defs.' Br. (Doc. 40) at 1.) Defendants argue that the appropriate sanction for Plaintiff's conduct is dismissal of Plaintiff's claims. (Id. at 14.)

To determine whether to impose dismissal as a sanction, a district court must consider:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

- 13 -

Projects Mgmt. Co. v. Dyncorp Int'l. LLC, 734 F.3d 366, 373–74
(4th Cir. 2013) (citing U.S. v. Shaffer Equip. Co., 11 F.3d 450,
462–63 (4th Cir. 1993)). Although this court does not find
dismissal an appropriate sanction, this court does find that
sanctions are appropriate. To that end, this court finds an
adverse inference regarding the outcomes of any testing
Defendants could have conducted on the intact engine is an
appropriate sanction.

## A.  Factor 1: Degree of the Wrongdoer's Culpability

First, there is a high degree of culpability on Plaintiff's
part for spoliation of evidence. After a vehicle has been in an
accident, when a plaintiff with access to that vehicle repairs
or disposes of it before a defendant has an opportunity to
inspect or test the damaged vehicle, the plaintiff has spoliated
key evidence such that sanctions, including dismissal, are
appropriate. See Silvestri, 271 F.3d at 591. In Silvestri, the
plaintiff was in a car accident. See id. at 586. The plaintiff
alleged that had the air bag deployed, he would not have
sustained disfiguring injuries. See id. He subsequently sued
General Motors, the car manufacturer. See id. at 587. However,
neither the plaintiff, nor his attorney, provided General Motors
with an opportunity to inspect or test the post-collision car,
"the sole piece of evidence in [the] case," before the car was

- 14 -

repaired and sold. See id. at 585, 587. The Fourth Circuit concluded that by failing to preserve this material evidence and by failing to provide General Motors with an opportunity to conduct their own crash tests and inspections of the car, the plaintiff breached his duty to not spoliate evidence, warranting dismissal of the case. Id. at 592, 595.

Here, neither party appears to dispute Plaintiff's duty to preserve the plane and engine. A key issue in this case is whether Defendants' service work on the plane caused the alleged overspeed events, (see First Am. Compl. (Doc. 15) at 7–9), and the condition of the plane is necessary to understand causation. The significance of inspecting the plane is clear from the expert reports. (See, e.g., Ex. 26, Handley Am. Report (Doc. 34-26) at 4 ("The engine inspection was limited because Mr. Fredeking prohibited me and the representatives from Triad Aviation, Inc., from doing any further in-depth necessary inspection and testing of essential components related to the alleged propeller overspeed condition."); Ex. 28, Sleeman Supp. Report with page numbers (Doc. 34-28) at 7 ("No investigation of the engine was conducted as a possible cause of low oil pressure to the governor or to the propeller.").)

The plane in its original condition and the engine are material evidence. See Silvestri, 271 F.3d at 591 ("The duty to

- 15 -

preserve material evidence arises not only during litigation, but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") Plaintiff, as the party filing the complaint, was aware that the plane and its engine were relevant evidence. In fact, Plaintiff's counsel's October 31, 2019 letter offering Defendants an opportunity to inspect the plane demonstrates at least Plaintiff's counsel's awareness of this obligation. (See Ex. 18, Oct. 31, 2019 Letter from B. Mundy to B. Ware (Doc. 34-18) at 1.) Even though discovery had not commenced and there was no court order requiring preservation of evidence, Plaintiff's obligation still applied. See West, 167 F.3d at 779 ("Even without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation.").

Despite this duty, Plaintiff failed to provide Defendants with a reasonable opportunity to inspect the plane and engine. Plaintiff's counsel repeatedly thwarted or rebuffed Defendants' attempts to schedule an inspection of the plane, ignoring Defendants' emails and letters, rescheduling the engine replacement on short notice, and even informing Defendants that the engine replacement would not be an "inspection." See generally supra Section I.B.

Plaintiff disagrees, asserting that Defendants failed to take advantage of numerous opportunities to inspect the plane, including during the period prior to litigation and during a "time-limited opportunity" Plaintiff offered after filing his complaint in October. (Pl.'s Resp. (Doc. 48) at 4-5.) However, these arguments are not persuasive.

First, Plaintiff contends that "[t]he aircraft and engine were held available during the two months following the subject overspeed events before the [West Virginia] action was filed . . . ." (Pl.'s Resp. (Doc. 48) at 5.) While it may have been poor customer service for Defendants not to immediately inspect the plane after the alleged overspeed events, that is a business decision. Plaintiff's duty to preserve evidence is a litigation duty. See Silvestri, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)). Once the West Virginia complaint was filed, Defendants made reasonable requests of Plaintiff's counsel to promptly inspect the engine; Plaintiff failed to provide an opportunity to inspect in keeping with the duty identified in Silvestri and West.

- 17 -

Although Plaintiff informed Defendants of the overspeed event, his August 15, 2019 letter stating that Defendants "should inform [their insurance carriers] of this claim and have them contact [Plaintiff]," (Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 35), neither puts Defendants on notice of impending litigation, nor does it suggest an urgent need to inspect the plane for discovery purposes.

Plaintiff's August 15th letter makes clear that he was deeply frustrated with the quality of Defendants' service work on his plane. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 33-35.) Nonetheless, Plaintiff is an attorney and had retained civil counsel in the West Virginia action when he responded to Defendant's counsel's request for an inspection. (See generally Ex. 18, Oct. 31, 2019 Letter from B. Mundy to B. Ware (Doc. 34-18) at 1.) Plaintiff's likely frustration is not a justifiable basis upon which to disregard a procedural duty.

Second, Plaintiff argues that because Defendants failed to "avail themselves of a [time-limited] opportunity to inspect the aircraft," he is not responsible for the loss in evidence. (Pl.'s Mem. Of Points and Authorities to Defs.' Triad Aviation, Inc. and H&H Propeller Service Inc.'s Mot. for Sanctions ("Pl.'s Resp.") (Doc. 48) at 5.) Plaintiff argues that none of Defendants' communications sought an "extension of the deadline

to inspect the aircraft," so Defendants' opportunity to inspect the aircraft had expired. (Id. at 6–8.)

However, this argument is similarly unconvincing. Only six days after filing suit, Plaintiff sent a letter to Defendants granting them twenty days from date of the letter to conduct an inspection. (See Ex. 18, Oct. 31, 2019 Letter from B. Ware to Mundy (Doc. 34-18) at 1.) Defendants' counsel had not even joined the case at this point. (See Ex. 1, Nov. 19 Email from B. Ware to B. Mundy (Doc. 48-1) at 1.) This missed deadline Plaintiff cites as his excuse for not allowing Defendants to inspect the plane later is one that Plaintiff unilaterally set, prior to the appearance of counsel for Defendants. The record currently before the court does not suggest any reasonable basis for Plaintiff's "time-limited opportunity" to inspect the plane, nor any authority for such a limitation.

Defendants repeatedly sought other opportunities to inspect the plane prior to the engine replacement and made themselves available to Plaintiff's last-minute schedule changes, but even then, Plaintiff did not allow Defendants to inspect the plane. See supra Section I.B. Furthermore, the deadline—with such a short turnaround time—appears unreasonable to this court.

## B.    Factor 2: Extent of the Client's Blameworthiness

Second, Plaintiff is blameworthy for the spoliation of evidence. See Silvestri, 271 F.3d at 592 (holding that the plaintiff's attorneys conduct was imputable onto the plaintiff for purposes of a sanctions motion even when the plaintiff had not originally hired the attorney, the plaintiff argued the attorney committed malpractice, and the plaintiff subsequently discharged the attorney). In Silvestri, the Fourth Circuit noted two facts that supported finding the plaintiff blameworthy for his attorney's actions. See id. First, the plaintiff had authorized his attorney to prepare for litigation, which included inspecting the damaged vehicle. See id. Second, the plaintiff himself was aware of the importance of preserving the damaged vehicle. See id.

Here, Plaintiff is an attorney, (see Defs.' Excerpts of Pl.'s Dep. (Doc. 34-1) at 2), and he does not provide any evidence that he or his counsel were unaware of his obligation to preserve evidence. Furthermore, Plaintiff's deposition indicates that he was aware that Defendants sought to inspect the plane and that Plaintiff's counsel was communicating with Defendants regarding an inspection. (See id. at 6.) Notably, Plaintiff did not tell the mechanics he hired to replace the engine about the ongoing litigation, (see id.), and as a result,

the mechanics did not budget time for Defendants to conduct any tests during the engine replacement, such as a transfer collar test. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up on Inspection (Doc. 34-24) at 2-3.) Defendants allege that Plaintiff's mechanics "would not have agreed to come to Tri-State Airport on the date that [they] did had [they] been informed of the lawsuit . . . ." (Id. at 3.) This demonstrates that Plaintiff knew of his obligation and knew his attorney was at least discussing the engine inspection with Defendants.

Finally, by offering to sell the engine to Defendants after the engine replacement, Plaintiff sought monetary compensation for merely fulfilling his Silvestri obligation to preserve to material evidence. Plaintiff offers no authority to justify this tactic, particularly considering that Plaintiff could have allowed the inspection as early as December 2019.

Although Plaintiff claims that he was only seeking to mitigate damages by repairing the plane and sending the engine back to the manufacturer, (see Pl.'s Resp. (Doc. 48) at 14), Plaintiff has not shown why allowing Defendants to inspect the plane prior to or during the engine replacement might have interfered with his efforts to mitigate damages. Thus, Plaintiff's assertion of justification based on mitigation of damages is unavailing.

**C.** **Factors 3 and 4: Prejudice to the Judicial Process and the Defendants**

On the third and fourth factors, this court finds that Defendants' inability to inspect the intact plane or the plane's engine causes prejudice to the judicial process and to Defendants. In particular, because neither party has conducted, nor can conduct, a transfer collar test, neither this court, nor a jury, may be able to determine the cause of the alleged overspeed events. Both Plaintiff's and Defendants' experts agree that a transfer collar test would have been useful in determining the cause of the alleged overspeed events. (See, e.g., Ex. F ("Pl.'s Excerpts of Dennis Handley Dep.") (Doc. 44-2) at 6 ("[I]n the propeller overspeed situation, oil pressure could be a factor, as it would pertain to those things delivering oil to the governor, the governor delivering oil satisfactorily through the transfer collar, in this application 550C engine, to the crankshaft and there again, another issue internally of the propeller hub itself and going up to the dome where the oil is captured there, a malfunction in that capacity."); Ex. G ("Pl.'s Excerpts of Douglas Sleeman Dep.") (Doc. 44-3) at 5 ("Q: There was just no tests done . . . to determine if there was any engine internal leakage; correct? A: Yeah, no evidence of that and that would have been something

that Triad would have been responsible for. Q: But there is no
way to determine that now; correct? A: Yeah, no way to determine
it.").)

Sanctions may be imposed to "preserve the integrity of the
judicial process in order to retain confidence that the process
works to uncover the truth." Silvestri, 271 F.3d at 590.
"[B]ecause no one has an exclusive insight into truth, the
process depends on the adversarial presentation of evidence,
precedent and custom, and argument to reasoned conclusions—all
directed with unwavering effort to what, in good faith, is
believed to be true on matters material to the disposition."
Shaffer Equip. Co., 11 F.3d at 457.

In Silvestri, the court explained that the loss of the car
"denied General Motors access to the only evidence from which it
could develop its defenses adequately." Silvestri, 271 F.3d at
594. General Motors was "highly prejudiced" by the loss in
evidence. Id. at 595. Like in Silvestri, Defendants too are
prejudiced by the inability to inspect the intact plane or the
plane engine. Among other repairs, Defendants were originally
hired to overhaul the plane engine and propellor. (See generally
March 11, 2019 Work AZ (Doc. 34-6).) Defendants' repairs and
workmanship are a key issue in this case. (See First Am. Compl.
(Doc. 15) at 7–9.) Defendants dispute that their service work

- 23 -

caused any alleged overspeed event. (See Defs.' Br. on Defs.'
Mot. for Summ. J. (Doc. 34) at 12-13.) Without inspecting the
engine, Defendants were limited to inspecting only the propellor
and propellor governor; they can only speculate to any potential
engine-related causes of the alleged overspeed events.

Plaintiff did not permit Defendants to conduct a transfer
collar test on the engine during the February 18, 2020 engine
replacement. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re
Following up on Inspection (Doc. 34-24) at 2-3.) Both
Plaintiff's and Defendants' experts have noted that a transfer
collar test would have been useful in determining possible
causes of the alleged overspeed events. (Compare Ex. 28, Sleeman
Supp. Report with page numbers (Doc. 34-28) at 5, with Ex. 27,
Handley Aff. (Doc. 34-27) at 3-4.)

In fact, Plaintiff's expert, Douglas Sleeman, notes in his
report: "[s]ince the engine was fresh out of overhaul[,] an
issue with transfer collar leakage would have been due to the
overhaul work." (Ex. 28, Sleeman Supp. Report with page numbers
(Doc. 34-28) at 5.) Mr. Sleeman elaborated in his deposition:

> Q: [W]hat was the next potential failure mode
> that you considered?
> A: Well, it's a leakage path between the governor
> and the propeller, basically the transfer
> collar. . . .
> Q: So there was no test for any potential leakage
> regarding the transfer collar; correct?

A: Yeah, that's right. Quite typically . . . a
malfunction like that might occur either – usually the
first few hours of engine operation . . . . [T]he
leakage would increase over operating time with the
engine . . . coming fresh out of overhaul unless it
was an assembly mistake . . . .
        Q: [T]here was just no tests done . . . to
determine if there was any engine internal leakage;
correct?
        A: Yeah, no evidence of that and that would have
been something that Triad would have been responsible
for.
        Q: But there is no way to determine that now;
correct?
        A: Yeah, no way to determine it.

(Pl.'s Excerpts of Douglas Sleeman Dep. (Doc. 44-3) at 5.) Mr.

Sleeman employs a process of elimination method to arrive at his

opinion on potential causes of the overspeed event, (see Ex. 28,

Sleeman Supp. Report with page numbers (Doc. 34-28) at 5), but

it appears to this court that without a transfer collar test,

one potential cause cannot be fully ruled out.

   Mr. Sleeman explained that he ruled out a transfer collar

leak as a likely cause of the alleged overspeed events based on

the timing of the overspeed events. (See Pl.'s Excerpts of

Douglas Sleeman Dep. (Doc. 44-3) at 11.) Defendant's expert,

Dennis Handley, has not addressed this assertion. Even so,

Defendant lost the opportunity to investigate this potential

cause of the alleged overspeed events due to the spoliation of

evidence. At this point, a possible cause of the alleged

overspeed events cannot be fully developed.

- 25 -

This loss of material evidence prevents full examination of the allegations of faulty repair, prejudicing the Defendants and the judicial process by limiting Defendants' ability to present a factual defense.[2] Without examining the plane and engine, the underlying facts around the overspeed event cannot be fully investigated, litigated, or presented before a factfinder.

D. **Factor 5: Availability of Other Sanctions**

On the fifth factor, this court finds that lesser sanctions than dismissal are sufficient to mitigate the prejudice to Defendants. "While a district court has broad discretion in choosing an appropriate sanction for spoliation, 'the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" Silvestri, 217 F.3d at 590 (citing West, 167 F.3d at 779.)

In Silvestri, the defendant had no evidence available other than "incomplete and perhaps inaccurate" measurements collected by the plaintiff's experts. Silvestri, 271 F.3d at 595. Conversely, in this case, some evidence (such as the propellor and propeller governor) was preserved and available for bench

---

[2] This court further notes that the evidence that any overspeed events occurred appears to rest solely on Plaintiff's testimony. Therefore, it is possible that had a transfer collar test been performed and the engine inspected, with neither revealing any material defects, these results might have cast some doubt on the existence of any overspeed event.

testing even after the engine replacement. (See Ex. 29, Texas Aircraft Inspection Conclusion (Doc. 34-29) at 1.) Thus, an adverse inference on what the spoliated evidence could have revealed, instead of dismissal, is a sufficient sanction. See Hodge, 360 F.3d at 450.

###    E.    Factor 6: Public Interest

Finally, on the sixth factor, the public interest in "the integrity of the judicial process" is enough to find that sanctions are proper here. See Projects Mgmt. Co., 734 F.3d at 374 (affirming the district court's finding on the sixth factor when it noted that "certainly there's a public interest in ensuring the integrity of the judicial process.").

In sum, this court finds that by failing to allow Defendants an opportunity to inspect the intact plane and engine prior to the engine replacement and loss of the engine, Plaintiff spoliated evidence. The physical plane, as well as the timeline for replacing the engine, were all under Plaintiff's control. Even so, Plaintiff repeatedly ignored Defendants' requests for an inspection, delayed any inspections, carried out the engine replacement, and sent the allegedly faulty engine back to the manufacturer, preventing Defendants from ever inspecting the engine or plane while in the condition during which the overspeed events allegedly occurred. As a result,

Defendants must rely on partial and incomplete testing to present their defense. To alleviate this prejudice to Defendants, this court finds that an adverse inference on the implications of any testing on the intact plane or engine is appropriate.

Specifically, this court finds that any causes of the overspeed events that could only be investigated through testing of the plane's engine, either while still installed on the plane or through a bench test of the engine, will not be admissible.

IV. **CONCLUSION**

For the foregoing reasons, this court finds Defendants are entitled to an adverse inference instruction as a result of spoliation of evidence. Defendants shall submit a proposed instruction in accordance with the findings set forth herein.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Sanctions, (Doc. 39), is **GRANTED IN PART AND DENIED IN PART.** Defendants' Motion for Sanctions is **GRANTED** to the extent that Defendants request an adverse inference. Defendants are hereby directed to submit a proposed instruction based upon the findings set forth in this order, within 7 days of this order. Defendants' Motion for Sanctions is **DENIED** to the extent that Defendants request dismissal of the case.

This the 22nd day of December, 2022.

_____
United States District Judge