IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

R.R. FREDEKING, II,                 )
                                    )
          Plaintiff,                )
                                    )
     v.                             )          1:20-cv-612
                                    )
TRIAD AVIATION, INC.,               )
H&H PROPELLER SERVICE, INC.         )
and AIRCRAFT ACCESSORIES OF         )
OKLAHOMA, INC.                      )
                                    )
          Defendants.               )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendants Triad Aviation, Inc.'s and
H&H Propeller Service, Inc.'s Motion for Summary Judgment. (Doc.
33.)[1] For the reasons provided herein, Defendants' motion for
summary judgment will be granted as to Plaintiff's first and
second claims. Defendants' motion will be denied as to
Plaintiff's third claim.

Additionally before this court is Defendants' Motion to
Exclude and/or Limit Plaintiff's Expert Testimony. (Doc. 37.)

---

[1] All citations in this Memorandum Opinion and Order to
documents filed with this court refer to the page numbers
located at the bottom right-hand corner of the documents as they
appear on CM/ECF.

For the reasons provided herein, Defendants' motion to exclude will be denied.

## I.    FACTUAL BACKGROUND

This dispute centers around an alleged aircraft failure due to an alleged overspeed event. The record evidence in the light most favorable to the Plaintiff, the non-moving party, is as follows.

Plaintiff R.R. Fredeking, II is a West Virginia resident. (See First Am. Compl. (Doc. 15) at 1.) Defendants Triad Aviation, Inc. and H&H Propeller Service, Inc. (collectively "Defendants") are North Carolina corporations with their principal places of business in North Carolina.[2] (See id. at 1; see Answer of Defs. Triad Aviation, Inc. and H&H Propeller Service, Inc. ("Defs.' Answer") (Doc. 17) at 1.)

### A.    Overhaul of Plaintiff's Plane

Plaintiff owns a "Piper Malibu N567KC, a single engine aircraft powered by a Continental TISIO 550c engine using a variable pitch Hartzell propeller." (First Am. Compl. (Doc. 15) at 3.) Plaintiff contacted Defendants to discuss service work to

_____

[2] It appears to this court that Defendant Triad Aviation, Inc. and Defendant H&H Propeller Service, Inc. are both part of the same company or that Defendant H&H Propeller Service, Inc. is a subsidiary of Defendant Triad Aviation, Inc. Although this is not made clear in the parties' filings, this court will discuss the claims against both Defendants together.

- 2 -

be done on his plane. (See Ex. B, Pl.'s Aff. (Doc. 43) at 1–2.)
On January 2, 2019, Defendants emailed Plaintiff with an
estimate for an engine removal, overhaul, and re-installation;
total costs for the services approximated $69,500. (See id. at
5–7.) This initial estimate further stated that Defendants'
"warranty is 500 hours or one year, and then pro-rated to TBO on
parts." (Id. at 6; id. at 7.) Here, "TBO" means "Time Between
Overhauls." (Ex. C, Othman Rashed Tr. ("Pl.'s Excerpts of Othman
Rashed's Dep.") (Doc. 46) at 4.)

On February 4, 2019, Defendants emailed Plaintiff to inform
him that they were "still around 6+ weeks on engine overhauls,
but [they] hope that number will be lower by the time
[Plaintiff's] aircraft arrives." (Ex. B, Pl.'s Aff. (Doc. 43) at
8.)

On March 11, 2019, Plaintiff delivered his plane to
Defendants' facility, (see id. at 2), and he signed a "work
authorization form" detailing the services Defendants would be
providing, (see Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1).
Plaintiff also paid a deposit of $32,000 for Defendants' work.
(See Ex. B, Pl.'s Aff. (Doc. 43) at 2.) According to the work
authorization form, Defendants were authorized to overhaul the
plane's engine, overhaul the plane's propeller and governor,
conduct an annual inspection, magnaflux the engine mount, check

- 3 -

the plane for corrosion, and check the seal between the propeller and engine. (See Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1–2; see also Pl.'s Excerpts of Othman Rashed's Dep. (Doc. 46) at 6.)

In completing the service work on Plaintiff's plane, Defendants first removed the engine from the plane. (See id. at 7.) Then, they inspected the engine and plane, discovering several other issues beyond those listed in the work authorization that required repairs or replacement. (See Ex. 1, Fredeking Depo. ("Defs.' Excerpts of Pl.'s Dep.") (Doc. 34-1) at 3; see also Pl.'s Excerpts of Othman Rashed's Dep. (Doc. 46) at 7.) Defendants emailed Plaintiff to update him on the newly-discovered issues and to receive authorization for expenses beyond the initial estimate. (See Ex. 8, Apr. 25, 2019 Email (Doc. 34-8) at 1.) Defendant H&H Propeller Service, Inc. also purchased a propeller governor, which Defendants installed on the plane. (See Ex. 9, H&H Propeller Govr Work Order 23302 (Doc. 34-9) at 1.)

As part of the service work, Defendants conducted testing on the plane. (See, e.g., Ex. D ("Pl.'s Excerpts of Richard Diamond Dep.") (Doc. 44) at 10.) Defendants also drained the plane's engine of oil, installed a new filter, and filled the engine with new oil. (See id.) Additionally, Richard Diamond,

- 4 -

one of Defendants' employees, conducted a ground run of the engine to test the plane for any issues, which included filling the propeller with oil. (See id. at 12.) Defendants used a Triad-created checklist to inspect the plane, rather than a checklist created by any plane parts manufacturers. (See id. at 13-14.)

Ultimately, on August 1, 2019, Defendants updated the plane's logbooks to indicate completion of the service work and to return the plane to service. (See id. at 16-17; see also Ex. 13, Engine Aircraft and Propeller Logbook Entries (Doc. 34-13) at 1-3.)

In total, the service work cost Plaintiff $104,298.88. (See Ex. B, Pl.'s Aff. (Doc. 43) at 12.) Hangar costs were $27,872.20. (See id.) The engine overhaul charges were $69,951.05, with $43,840.00 for labor, $18,960 for parts, $5,500.00 for the crankcase, and $1,651.01 for tax. (See Ex. 11, July 8, 2019 Work Order (Doc. 34-11) at 1.) Purchasing the overhauled governor from Aircraft Accessories of Oklahoma cost $2,775.35, as well as $50.35 for freight. (See Ex. 9, H&H Propeller Govr Work Order 23302 (Doc. 34-9) at 1.) The propeller overhaul cost $3,579.01, with $1,467.00 for labor, $1,977.01 for parts, and $135 for materials. (See Ex. 12, H&H Propeller

- 5 -

Governor Work Order 23408 (Doc. 34-12) at 1.) Finally, refueling the plane cost $121.27. (See Ex. B, Pl.'s Aff. (Doc. 43) at 12.)

## B.  **Alleged Overspeed Events**

On July 31, 2019, Defendants emailed Plaintiff to inform him that the service work on his plane was completed. (See id. at 11.) In that email, they included a detailed invoice for the work, and they requested that Plaintiff reserve several hours for him to conduct a test flight and for a final inspection. (See id.)

On August 13, 2019, Plaintiff sent $72,298.88 to Defendants via bank wire to remit the balance due for the service work. (See id. at 3.) That same day, Plaintiff arrived at Defendants' facility in Burlington, NC to pick up his plane. (See Ex. A, Pl.'s Depo. ("Pl.'s Excerpts of Pl.'s Dep.") (Doc. 42) at 18.) He requested and received a copy of Defendants' warranty when he arrived. (See id. at 13.) Plaintiff testified that he believed Defendants' warranty was limited to what he had previously received by email—stating that the warranty covered "500 hours or one year." (Id.) However, the warranty provided to Plaintiff on August 13, 2019 stated:

> TRIAD will repair or replace on an exchange basis any
> engine or part supplied which within the applicable
> one (1) year or 500 hour period is returned to TRIAD
> and which upon examination is found to be defective in
> materials and workmanship. . . .

- 6 -

. . . .

> THIS IS A LIMITED WARRANTY. THE SOLE AND EXCLUSIVE
> REMEDY UNDER THIS WARRANTY IS LIMITED TO REPAIR OR
> REPLACEMENT AS SPECIFIED ABOVE. THERE ARE NO OTHER
> WARRANTIES, EXPRESS OR IMPLIED. SPECIFICALLY, BUT
> WITHOUT LIMITATION, THERE ARE NO IMPLIED WARRANTIES AS
> TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR
> PURPOSE. IN NO EVENT WILL TRIAD AVIATION, INC. BE
> RESPONSIBLE FOR ANY INCIDENTAL OR CONSEQUENTIAL
> DAMAGES ARISING OUT OF ANY DEFECT IN ANY ENGINE OR
> PART, ARISING OUT OF THE FAILURE OF ANY ENGINE OR PART
> TO OPERATE PROPERLY, OR ARISING OUT OF ANY BREACH OF
> THIS WARRANTY. . . .

(Ex. 14, Warranty (Doc. 34-14) at 1–3 (emphasis in original).)

On August 13 and 14, 2019, Plaintiff performed two test flights while accompanied by Richard Diamond, one of Defendants' employees. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 15.) During each of those two test flights, Plaintiff identified several issues needing further repair that Richard Diamond addressed or tried to address. (See id. at 18–20.) Plaintiff performed a brief third test flight. (See id. at 20.) Finally, on August 14, 2019, Plaintiff flew back to Huntington, West Virginia with his wife as a fourth and final test flight. (See id. at 21–22.)

Plaintiff alleges that during his approach to Huntington, approximately five to six miles from the runway, Plaintiff's plane experienced an overspeed event of approximately "4,000 RPMs." (See id. at 24–25.) Plaintiff continued descending towards Huntington, and closer to the runway, he alleges that a

- 7 -

second overspeed event occurred. (See id. at 26.) Finally, while Plaintiff was taxiing on the runway, he alleges that a third overspeed event occurred. (See id. at 27.) There remains a genuine dispute of material fact on these overspeed events, as Defendants dispute whether any overspeed events occurred at all. (See Mem. of Law in Supp. of Defs. Triad Aviation Inc. and H&H Propeller Service, Inc.'s Mot. for Summ. J. ("Defs.' Summ. J. Br.") (Doc. 34) at 1.)

Plaintiff explained that he was informed by the engine and propeller manufacturers that neither the plane, nor the engine, were airworthy due to the overspeed events. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 29; see Ex. B, Pl.'s Aff. (Doc. 43) at 3.) Plaintiff was unable to receive a ferry permit from the Federal Aviation Authority to have the plane flown back to Defendants' facility. (See Ex. B, Pl.'s Aff. (Doc. 43) at 3.)

On August 15, 2019, Plaintiff mailed Defendants a letter raising his concerns around Defendants' service work and to inform them of the overspeed events. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 33.) Plaintiff contacted Othman Rashed, one of Defendants' employees, about the overspeed events; Plaintiff testified that Mr. Rashed required Plaintiff to bring the plane or engine back to Defendants' facility in North Carolina for them to perform any repairs. (See id. at 5.)

- 8 -

Richard Diamond further testified that if a plane cannot be flown back to Defendants' facility for repairs, the plane's engine would need to be removed at the plane's location and brought back to Defendants' facility; however, to Mr. Diamond's knowledge, Defendants had never conducted such repairs at a plane's location previously. (See Pl.'s Excerpts of Richard Diamond Dep. (Doc. 44) at 11.)

Soon after the overspeed events, Plaintiff ordered a new engine, (see Ex. 16, Aug. 22, 2019, Purchase Order (Doc. 34-16) at 1), and a new propeller, (see Ex. 17, Oct. 2, 2019, Purchase Order (Doc. 34-17) at 1), from their respective manufacturers to replace the allegedly-faulty engine and propeller Defendants had serviced and installed.

## C. __Airplane Inspections__

On October 25, 2019, Plaintiff filed his first complaint in the United States District Court for the Southern District of West Virginia. See Compl., Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 1. The West Virginia complaint has since been dismissed, leading to the present case before this court. See Mem. Op. and Order, Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 11 (granting Defendants' motion to dismiss for lack of personal jurisdiction). Because some of the relevant

events occurred following the initial filing in the Southern District of West Virginia, the factual background will first address those events before discussing the filing of this case in the Middle District of North Carolina. See infra Part II.

On October 31, 2019, Plaintiff's counsel sent a letter to Defendants, "provid[ing] [Defendants] 20 days from the date of this letter to conduct" an inspection of the plane "prior to the replacement of [its] engine and prop[eller]." (See Ex. 18, Oct. 31, 2019 Letter from B. Mundy to B. Ware (Doc. 34-18) at 1.) Between November 2019 and February 2020—when Plaintiff had the plane's engine replaced so he could use his plane once again—the parties struggled to agree on a date for Defendants to come to West Virginia to inspect the plane. (See Mem. Op. and Order (Doc. 72) at 5–9.)

On February 18, 2020, Plaintiff had the plane engine replaced. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 23.) Defendants' employees and Defendants' expert, Dennis Handley, attended the engine replacement. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up on Inspection (Doc. 34-24) at 1–2.) During the engine replacement, Mr. Handley took notes and photographs of the plane and engine, physically manipulated the propeller governor, conducted a visual examination of the propeller governor, and took a sample of oil from the propeller

- 10 -

governor. (See Ex. F ("Pl.'s Excerpts of Dennis Handley Dep.")
(Doc. 44-2) at 3.) Several photos were taken of the oil from the
propeller governor, but the sample was not kept for testing.[3]
(See Ex. G ("Pl.'s Excerpts of Douglas Sleeman Dep.")
(Doc. 44-3) at 2.)

However, Defendants were not permitted to conduct extensive
testing, including a transfer collar test, of the plane at that
time. (See Ex. 24, Feb. 21, 2020 Letter to Pl. re Following up
on Inspection (Doc. 34-24) at 2-3.)

The propeller and propeller governor were removed from the
plane and preserved for future testing. (See Ex. 2, Mar. 24,

---

[3] Plaintiff seems to imply that Mr. Handley purposefully
failed to retain this oil sample. (See, e.g., Pl.'s Mem. of P. &
A. in Opp. to Defs. Triad Aviation, Inc. and H&H Propeller
Service, Inc.'s Mot. for Summ. J. ("Pl.'s Summ. J. Opp. Br.")
(Doc. 41) at 14 (titling a section as "Spoliation of Evidence by
Defendants' Expert"); id. at 15-16 ("Despite knowing the
importance of the propeller governor as it relates to potential
overspeed events, and the fact that there was no agreed upon
inspection protocol in place, Mr. Handley physically manipulated
the propeller governor during the February 18, 2020 inspection.
Physically turning the driveshaft and the control arm could
dislodge any particulate or contaminate causing the governor to
malfunction.") (internal citations omitted); id. at 16 ("Despite
the evidence showing physical signs of contamination, Mr.
Handley did not preserve the sample of oil he personally
captured from the propeller governor.").) Defendants refute
Plaintiff's assertion that Mr. Handley purposefully failed to
retain the oil sample. (See, e.g., Reply Memorandum in Supp. of
Defs.' Mot. for Summ. J. ("Defs.' Reply") (Doc. 49) at 8-9.)
Plaintiff has not filed a motion for sanctions for spoliation of
evidence, so this court will not address this issue further at
this time.

2020 Letter to Mundy (Doc. 40-2) at 1.) However, the plane's engine was not preserved for additional testing, and Plaintiff returned the engine to its manufacturer, Continental Motor Group.[4] (See Defs.' Excerpts of Pl.'s Dep. (Doc. 34-1) at 8.)

On November 11, 2021, Plaintiff and Defendants attended a bench inspection of the plane's propeller governor. (See Pl.'s Excerpts of Dennis Handley Dep. (Doc. 44-2) at 3.) Texas Aircraft Propeller & Accessories bench-tested the plane propeller and propeller governor. (See Ex. 29, Texas Aircraft Inspection Conclusion (Doc. 34-29) at 1.) They found no evidence that either the propeller, or the propeller governor, operated outside of design limitations. (See id.) Additionally, oil samples were collected for further testing. (See Ex. 30, Edwards Suppl. Report (Doc. 34-30) at 5.)

Finally, on January 24, 2022, Mr. Handley combined the oil samples collected during the November 11, 2021 inspection and shipped them to AvLab for testing. (See Ex. 26, Handley Am. Report (Doc. 34-26) at 4.) Mr. Handley reported that AvLab found

---

[4] Defendants have brought a motion for sanctions for spoliation of evidence because they were not able to inspect the plane engine. (See Doc. 39.) Defendants again raise the issue of spoliation of evidence in their summary judgment briefing. (See Doc. 34 at 6-8.) As this court has addressed the issue of spoliation separately, (see Doc. 72), this court will not further discuss the issue of spoliation in this Memorandum Opinion and Order.

that "[a]ll oil values seem fine for the engine break-in cycle."
(See id.)

D. **Material Disputes over Experts' Findings**

Plaintiff has disclosed two expert witnesses: Douglas
Sleeman and Jeffrey Edwards. (See Ex. 32, Pl.'s Second Am.
Expert Witness Disclosure (Doc. 34-32) at 1–2.) Defendants have
identified one expert witness: Dennis Handley. (See Ex. J,
Defs.' Expert Disclosure (Doc. 44-6) at 1.) Both parties' expert
witnesses disagree on whether any overspeed events occurred, and
if so, on the cause of the alleged overspeed events. (Compare
Ex. 26, Handley Am. Report (Doc. 34-26) at 1, with Ex. H
("Douglas Sleeman Investigation Report") (Doc. 44-4) at 7.)

Thus, there exists a genuine dispute of material fact on
the occurrence of any overspeed events and on whether
Defendants' service work caused the alleged overspeed events.

Plaintiff's first expert, Jeffrey Edwards, provided notes,
observations, and photographs from the November 11, 2021
propeller and propeller governor bench test by Texas Aircraft
Propeller & Accessories, as well as summaries of the
February 18, 2020 engine replacement and the January 24, 2022
oil sample collection and testing. (Ex. 30, Edwards Suppl.
Report (Doc. 34-30) at 1–7.)

- 13 -

Plaintiff's second expert, Douglas Sleeman, issued a report finding that "the probable cause of the engine and propeller overspeeds were due to a malfunction of the propeller governor, most likely due to contamination." (Douglas Sleeman Investigation Report (Doc. 44-4) at 7.) Mr. Sleeman explained that "[t]here is evidence of contaminated oil from within the governor." (Id.)

Mr. Sleeman's findings were based on reviewing video footage and photos of the February 18, 2020 engine replacement, attending the November 11, 2021 propeller and propeller governor bench test by Texas Aircraft Propeller & Accessories via video conference, and analyzing Mr. Edwards' report. (See id. at 1-7; see also id. at 40-41.) He arrived at his conclusion by going through a process of elimination to identify possible failure modes that could result in an overspeed event. (See Pl.'s Excerpts of Douglas Sleeman Dep. (Doc. 44-3) at 5-8.) He also explained that the photos of oil from the propeller governor taken during the February 18, 2020 engine replacement showed visible contamination.

> Q: All right. And how does that show contaminated oil?
>
> A: Well, you see the dark oil that has leaked onto the paper? That's also supplemented by the next page which shows oil collected from the governor in the bottom of this container that is dark and obviously there's particulates in it as

- 14 -

well. There's a collection that Mr. Handley said
came from the governor probably from him moving
the input lever and turning the driveshaft to try
to drain the oil out.

. . . .

Q: . . .[Y]ou claim that you observed some
particles in the oil that it wasn't necessary to
go any further in terms of doing a thorough
scientific analysis of what may have caused the
propeller overspeed; is that correct?

A: Yeah, in so many words I guess I would agree.
There was evidence of contamination and there
wasn't any other evidence of another cause
regarding the governor so, yeah, based on the
evidence [that] was there.

Q: Well, there was no other evidence of cause
because some of the tests [that] could have
revealed other causes were not conducted; is that
a fair assessment?

A: No, I don't think I'd necessarily agree with
that. . . . Some of those tests are just a matter
of process of elimination. You might say just
thoroughness of an investigation, but there
wasn't any suggestion in the functional tests
that they ran that necessary needed to be done. I
would have just done them for thoroughness.

. . . .

Q: . . .[D]o you have any idea as to where [the
oil] contamination came from?

A: Well, contamination in the governor came from
the engine. I don't believe it was done by the
Oklahoma people when they assembled and tested
the governor and shipped it out since the oil in
the engine was so apparently dirty as it were.
The oil – the contamination hadn't come from the
oil; that comes from the engine.

- 15 -

(Id. at 2-9.) In his deposition, Mr. Sleeman further described the contamination as a "phantom particle" that was "lost or dislodged" during the course of the investigation. (Id. at 6.)

In his expert report, Defendants' expert, Dennis Handley, shared notes and observations from the February 18, 2020 engine replacement, the November 11, 2021 propeller and propeller governor bench test, and the January 24, 2022 oil sample collection and testing. (See Ex. 26, Handley Am. Report (Doc. 34-26) at 2-4.) Mr. Handley reported that "no physical evidence has been discovered to identify any source of the alleged propeller overspeed . . . . I can find nothing specifically done by Triad Aviation, Inc., that would have caused a propeller overspeed condition." (Id. at 4-5.) However, in his deposition, Mr. Handley did acknowledge several issues on the plane "that came directly from [Triad], that should not have happened," as well as issues that an "annual inspection should . . . have discovered . . . ." (Pl.'s Excerpts of Dennis Handley Dep. (Doc. 44-2) at 4.) Furthermore, regarding the oil sample he collected and photographed during the February 20, 2020 engine replacement, Mr. Handley conceded that the "sample shows particulates" and that "brand new oil should not have that." (Id. at 6.)

## II.  **PROCEDURAL HISTORY**

On October 25, 2019, Plaintiff filed his first complaint in the United States District Court for the Southern District of West Virginia. See Compl., Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 1. The West Virginia complaint has since been dismissed, leading to the present case before this court. See Mem. Op. and Order, Fredeking v. Triad Aviation. Inc., No. 3:19-cv-00777 (S.D.W.V. Mar. 27, 2020), Doc. 11 (granting Defendants' motion to dismiss for lack of personal jurisdiction).

On July 2, 2020, Plaintiff filed his complaint in the Middle District of North Carolina, (see Compl. (Doc. 1)), and subsequently filed his amended complaint, (see First Am. Compl. (Doc. 15)). Originally, Plaintiff brought claims against Triad Aviation, Inc., H&H Propeller Service, Inc., and Aircraft Accessories of Oklahoma, Inc. (See id.) Plaintiff's claims against Aircraft Accessories of Oklahoma were dismissed with prejudice. (See Dec. 16, 2021 Order (Doc. 28).) Plaintiff currently brings three claims against the remaining two Defendants: (1) breach of the implied warranty of merchantability, (2) negligent repairs, and (3) breach of contract. (See First Am. Compl. (Doc. 15) at 7–9.)

Defendants filed a motion for summary judgment, (see Doc. 33), along with a supporting memorandum, (see Defs.' Summ. J. Br. (Doc. 34)). Plaintiff responded in opposition. (See Pl.'s Summ. J. Opp. Br. (Doc. 41).) Defendants replied. (See Defs.' Reply (Doc. 49).) Defendants' motion for summary judgment is ripe for disposition.

Defendants also filed a motion for sanctions for spoliation of evidence, (see Doc. 39), which this court has addressed separately, (see Doc. 72).

Finally, Defendants filed a motion to exclude and/or limit Plaintiff's Expert Testimony, (see Doc. 37), as well as a supporting memorandum, (see Defs.' Triad Aviation, Inc. and H&H Propeller Service, Inc.'s Br. in Supp. of their Mot. to Exclude and or limit Pl.'s Expert Test. ("Defs.' Mot. to Exclude Br.") (Doc. 38)). Plaintiff responded in opposition. (See Doc. 47.) Defendants replied. (See Doc. 50.) Defendants' motion to exclude is also ripe for disposition.

## III. **Defendants' Motion to Exclude and/or Limit Plaintiff's Expert Testimony**

Defendants have filed a motion to exclude Plaintiff's expert testimony. (See Doc. 37.) Defendants move to exclude both of Plaintiff's experts, Douglas Sleeman and Jeffrey Edwards. (See id.) This court finds that Defendants' motion ultimately

- 18 -

attacks the credibility and weight of Plaintiff's experts' testimony, not the reliability or admissibility of the experts' testimony. Thus, Defendants' motion will be denied as to either of Plaintiff's experts.

A. **Legal Standard**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow. Pharms., Inc., 509 U.S. 579 (1993), the Supreme Court clarified "that it is the duty of the trial court to perform the gatekeeping function with respect to expert testimony: 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" United States v. Prince-Oyibo, 320 F.3d 494, 498 (4th Cir. 2003) (emphasis in original) (quoting Daubert, 509 U.S. at 589). The Supreme Court in Daubert provided a list of

- 19 -

non-exclusive factors a court should consider in assessing the reliability of expert testimony: (1) whether the particular scientific theory or technique "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) "the known or potential error rate"; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved widespread acceptance in the relevant scientific community. Daubert, 509 U.S. at 593–94. A trial court has "considerable leeway" both in determining an expert's reliability and in its ultimate conclusion on admissibility. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152–53 (1999).

**B.  Douglas Sleeman**

Defendants raise three arguments in support of excluding Plaintiff's expert Douglas Sleeman's testimony: (1) his "opinion is not supported by sufficient facts or data," (Defs.' Mot. to Exclude Br. (Doc. 38) at 16); (2) he "employed unreliable methodology in arriving at his opinion," (id. at 18); and (3) his "opinion is not relevant and therefore will not aid the jury," (id. at 20).

This court finds that Mr. Sleeman's testimony is sufficiently based on facts and data, that he uses reliable methods to reach his findings, and that his opinion is relevant

- 20 -

to a material issue. Thus, Defendants' motion to exclude
Mr. Sleeman's expert opinion will be denied.

### 1. Mr. Sleeman's Opinion is Supported by Facts and Data.

First, Defendants contend that Mr. Sleeman's testimony is
not based on sufficient facts or data because he relies solely
on a photo of allegedly-contaminated oil from the February 8,
2020 engine replacement to develop his contaminated oil theory
of causation. (Defs.' Mot. to Exclude Br. (Doc. 38) at 16-18.)

Defendants argue that Mr. Sleeman "has no data,
measurements, or other scientific analysis regarding the
particulate matter he claims existed in the oil in the photos."
(Id. at 17.) However, per his expert report, Mr. Sleeman relied
on process of elimination to arrive at his opinion that
contaminated oil caused the overspeed events. (Ex. 28, Sleeman
Suppl. Report with page numbers (Doc. 34-28) at 5-7.) Process of
elimination has been considered a valid scientific approach for
an expert to reach their opinion. See Esposito v. Home Depot
U.S.A., Inc., No. 06-153S, 2010 WL 5173338, at *2 (D.R.I.
Dec. 14, 2010) (explaining that process of elimination is
"fundamentally no different than a 'differential diagnosis' in
the medical context, in which all reasonable hypotheses are
systemically ruled out in order to determine the most probable

- 21 -

cause of a problem"). Thus, Mr. Sleeman's process of elimination is a sufficient "scientific analysis" for arriving at his conclusions.

Furthermore, Defendants contend that Mr. Sleeman "ignor[ed] the scientific tests, inspections, data and analysis from Texas Aircraft." (Defs.' Mot. to Exclude Br. (Doc. 38) at 17.) However, Mr. Sleeman's process of elimination approach appears to account for findings from all three inspections, including the Texas Aircraft analysis. (See Ex. 28, Sleeman Suppl. Report with page numbers (Doc. 34-28) at 5-7; see, e.g., id. at 7 ("The propeller functioned properly on test, the pitch stops were properly set and no indication of piston seal failure. There was no visible evidence of damage caused by the overspeeds.")

Finally, Defendants argue that the photo of allegedly-contaminated oil that Mr. Sleeman relies on does not actually demonstrate evidence of oil contamination, particularly given the AvLab test results. (See Defs.' Mot. to Exclude Br. (Doc. 38) at 16.) In fact, Defendants argue that Mr. Sleeman "ignored the laboratory test results of AvLab showing the oil to be normal. . . ." (Id.) However, in his deposition, Mr. Sleeman explained why he discounted the AvLab oil test results, so he does not "ignore" them. (See Pl.'s Excerpts of Douglas Sleeman Dep. (Doc. 44-3) at 3.) To that end, Mr. Sleeman explained that

physical manipulation of different parts of the plane during the February 18, 2020 engine replacement could have caused the contamination visible in the oil sample photos to be dislodged, so it would not be present in the oil sample taken months later and tested by AvLab. (See id. at 3, 6.) In his deposition, Defendants' expert, Mr. Handley, seems to corroborate Mr. Sleeman's findings, explaining that the February 20, 2020 "sample shows particulates" and that "[b]rand new oil should not have that." (Pl.'s Excerpts of Dennis Handley Dep. (Doc. 44-2) at 6.)

In sum, this court finds that Mr. Sleeman's opinion is adequately supported by facts and evidence for Rule 702 purposes.

### 2. Mr. Sleeman's Methodology is Reliable.

Second, Defendants contend that "Mr. Sleeman's methodology of supposedly excluding other potential causes to arrive at the phantom particle theory is flawed." (Defs.' Mot. to Exclude Br. (Doc. 38) at 18.) However, this argument is unconvincing. Process of elimination is a reliable methodology for an expert to use to arrive at his conclusion. See Esposito, 2010 WL 5173338, at *2; see also supra Section III.B.1. Mr. Sleeman reviewed video footage and photos of the February 18, 2020 engine replacement, attended the November 11, 2021 propeller and

- 23 -

propeller governor bench test via video conference, and analyzed
Mr. Edwards' report and notes of the November 11, 2021
inspection. (See Douglas Sleeman Investigation Report (Doc. 44-
4) at 1-7.) He then "consider[ed] all the likely potential
failure modes which would cause a sustained overspeed[,] . . .
us[ing] the process of elimination to determine the most
probable cause or causes." (Id. at 5.)

Additionally, Defendants contend that Mr. Sleeman's process
of elimination method was flawed because Mr. Sleeman admits that
other tests could have been conducted as well. (See Defs.' Mot.
to Exclude Br. (Doc. 38) at 18-19.) Although Mr. Sleeman
acknowledges in his deposition that other tests may have been
helpful, he explains that those other tests would have been to
"doublecheck" a leakage issue. (See Pl.'s Excerpts of Douglas
Sleeman Dep. (Doc. 44-3) at 11.) Furthermore, from Mr. Sleeman's
deposition, it appears that he ruled out issues that these
additional tests would have revealed, (see id.)—which is the
very outcome Defendants would expect if there was no overspeed
event, as they claim. Even if additional tests would have been
helpful to corroborate his ultimate conclusions, this argument
goes to the credibility and weight of Mr. Sleeman's opinion,
rather than the reliability of his methodology.

- 24 -

That Mr. Sleeman does not point to peer reviewed studies discussing the phantom particle theory does not require exclusion of his testimony. "[W]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of [peer review or publication] may go to the weight, not the admissibility of the expert's testimony." Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1298 (Fed. Cir. 2015) (quoting Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 354 (5th Cir. 2007)) (internal quotation marks omitted). "To the extent [Mr. Sleeman's] credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility." Id. at 1299. Ultimately, this court finds that Mr. Sleeman's methodology was based on reliable principles.

### 3. Mr. Sleeman's Opinion is Relevant.

Third, Defendants contend that Mr. Sleeman's opinion is not relevant because he does not directly "factually connect the 'phantom particle' to any work of Defendants that would have caused the phantom particle.'" (Defs.' Mot. to Exclude Br. (Doc. 38) at 20.) However, Mr. Sleeman's expert opinion speaks directly to potential causes of the alleged overspeed events. (See Douglas Sleeman Investigation Report (Doc. 44-4) at 7.) He explains that "the probable cause of the engine and propeller overspeeds were due to a malfunction of the propeller governor,

- 25 -

most likely due to contamination." (Id.) Because it is undisputed that Defendants did fill the plane engine with oil, (see Pl.'s Excerpts of Richard Diamond Dep. (Doc. 44) at 10), and Defendants' expert acknowledged that "brand new oil should not have" contaminants (see Pl.'s Ex. of Dennis Handley Dep. (Doc. 44-2) at 6), contaminated oil appears reasonably relevant to causation issues.

There remains a genuine factual dispute about what caused the alleged overspeed events, so Mr. Sleeman's opinion on causation will help the jury determine a fact at issue. Thus, this court finds that Mr. Sleeman's opinion is relevant.

Mr. Sleeman's opinion is supported by facts, his methodology is reliable, and his opinion is relevant to material issues. This court will deny Defendant's motion to exclude Mr. Sleeman's expert testimony.

## C. **Jeffrey Edwards**

In their motion, Defendants assert that Jeffrey Edwards' expert testimony should also be excluded. (See Doc. 37 at 1.) Defendants provide no arguments specific to Mr. Edwards' testimony in their brief. (See generally Defs.' Mot. to Exclude Br. (Doc. 38) at 5-6.) The gravamen of Defendants' argument regarding Mr. Edwards' testimony appears to be that he provides mere observations, not opinion testimony. (See id.)

However, Mr. Edwards observed and reported findings from the November 11, 2021 inspection and the AvLab oil sample test. (Ex. 30, Edwards Suppl. Report (Doc. 34-30) at 1-7.) His observations require specialized knowledge, i.e., "[t]he speeder spring and rack were intact with no distress noted." (Id. at 3.) Determination of the cause of any overspeed events is the product of direct and circumstantial evidence, with the circumstantial evidence requiring an analysis of which parts of the plane were in good working order and which were not or which parts may be suspect.

Additionally, Mr. Edwards' testimony would provide more than mere observations, but also his opinion on the methods by which the various tests were conducted. For example, in his deposition testimony, he discusses when and how oil sampling and testing should have been conducted compared to how it was actually conducted; this would help a finder of fact determine any weight to assign the results of the AvLab oil sample testing. (See Ex. B, Pl.'s Excerpts of Jeffrey Edwards Dep. (Doc. 47-2) at 2.)

This court finds that Mr. Edwards' expert testimony is admissible. Defendants' motion to exclude his testimony will be denied.

## IV. **Defendants' Motion for Summary Judgment**

Defendants have filed a motion for summary judgment on all three of Plaintiff's claims. (See Doc. 33.) First, they argue that Plaintiff does not establish that Defendants caused the alleged overspeed event, so all of Plaintiff's claims should be dismissed. (See Defs.' Summ. J. Br. (Doc. 34) at 12-13). Second, Defendants argue that Plaintiff's claim for breach of the implied warranty of merchantability should be dismissed for several reasons. (See id. at 14-17). Third, they argue that Plaintiff's claim for negligent repairs should be dismissed under North Carolina's economic loss rule. (See id. at 13-14). Fourth, they argue that Plaintiff's claim for breach of contract should be dismissed because Plaintiff has not shown any evidence of breach. (See id. at 17-19). Fifth, Defendants reassert their position on spoliation of evidence. (See id. at 19-22).

This court will grant summary judgment in favor of Defendants on Plaintiff's claim for breach of the implied warranty of merchantability and on Plaintiff's claim for negligent repairs. However, this court will deny summary judgment on Plaintiff's claim for breach of contract. Finally, this court has addressed Defendants' position on spoliation of evidence, as well as Defendants' motion for sanctions, (see Doc. 39), in a separate Memorandum Opinion and Order, (see Doc. 72).

## A.    <u>Legal Standard</u>

In reviewing a motion for summary judgment, this court must determine whether there remains a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." <u>Sylvia Dev. Corp. v. Calvert Cty. Md.</u>, 48 F.3d 810, 817 (4th Cir. 1995). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). If there is no genuine dispute about any fact material to the moving party's claim, then "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289-90 (1968) (stating that a dispute is not genuine for summary judgment purposes when one party rests solely on allegations in the pleadings and does not produce any evidence to refute alternative arguments). This court must look

- 29 -

to substantive law to determine which facts are material—only those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

In addition, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 247-48. "[T]he non-moving party must do more than present a 'scintilla' of evidence in its favor." Sylvia Dev., 48 F.3d at 818 (citing Anderson, 477 U.S. at 252). Ultimately, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

### B. **Breach of Implied Warranty of Merchantability**

Plaintiff brings a claim for breach of the implied warranty of merchantability under the Uniform Commercial Code ("UCC"). (See First Am. Compl. (Doc. 15) at 7.) Defendants argue that Plaintiff's claim fails for three reasons: (1) the propeller governor sold by Defendants to Plaintiff was found to have no defects; (2) Defendants' express warranty disclaimed any implied warranties; and (3) the UCC does not apply to Plaintiff's contract with the Defendants, as the contract was for services, not sale of goods. (See Defs.' Summ. J. Br. (Doc. 34) at 15–17.)

- 30 -

This court finds that the UCC does not apply to Plaintiff's contract with the Defendants, so Plaintiff's claim for the implied warranty of merchantability is not applicable. Thus, summary judgment in favor of Defendants is appropriate for Plaintiff's first claim.[5]

Although the UCC typically governs transactions for goods, not contracts for the provision of services, the UCC may also govern mixed contracts for goods and services. See N.C. Farm Bureau Mut. Ins. v. Strickland's Auto & Truck Repairs, Inc., No. 1:19cv513, 2021 WL 633646, at *11 (M.D.N.C. Feb. 18, 2021). "When a contract is a mixed one for the sale of goods and services, the Fourth Circuit has held that '[w]hether a particular transaction is governed by the U.C.C. rather than the common law or other statutory law, hinges on the predominant purpose of the transaction. . . .'" Parks v. Alteon, Inc., 161 F. Supp. 2d 645, 649 (M.D.N.C. 2001) (quoting Princess Cruises, Inc. v. General Elec. Co., 143 F.3d 828, 832-22 (4th Cir. 1998)). A panel of the Fourth Circuit has held, persuasively, that courts should consider three factors to determine the contract's primary purpose: "(1) the language of the contract;

_____

[5] Although Defendants raise three arguments in favor of summary judgment, this court only addresses one—whether the UCC applies to Plaintiff's contract with Defendant at all. Because this court finds that the UCC does not apply, this court need not address Defendants' other two arguments.

the nature of the business of the supplier; and (2) the intrinsic worth of the materials involved." RMS Tech., Inc. v. TDY Indus., Inc., 64 F. App'x 853, 855 (4th Cir. 2003). For the reasons discussed below, the three factors considered together suggest the predominant purpose of the contract was provision of services, not sale of goods. Thus, the UCC does not govern the agreement and the implied warranty of merchantability does not apply.

### 1.  The Language of the Contract

First, the language of the contract suggests that the predominant purpose of the contract was to provide services—to overhaul Plaintiff's plane engine and conduct an inspection—not to sell goods. The original email with Defendants' estimate discusses "the overhaul of [a] Continental TSIO-550-C engine." (Ex. B, Pl.'s Aff. (Doc. 43) at 6.) "Overhaul" of a plane engine is "synonymous" with "repair," where "[r]epair means to restore by replacing a part or putting together what is torn or broken, to restore to a sound or healthy state." Melton v. Jewell, No. 1:02-CV-1242-T/P, 2006 WL 8434931, at *2 (W.D. Tenn. Sept. 12, 2006) (cleaned up). This definition of overhaul suggests an agreement to provide a service, not to sell a good. The agreement also included removal and reinstallation of the engine. (See id. at 7.) The work authorization form Plaintiff

signed details a list of services or repairs, not a list of parts or goods to be sold. (See Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1–2.)

However, two facts may suggest a goods contract rather than a services contract. Defendants' invoices include separate line items for parts versus labor. (See Ex. 11, July 8, 2019 Work Order (Doc. 34-11) at 1; see Ex. 12, H&H Propeller Governor Work Order 23408 (Doc. 34-12) at 1.) Additionally, under the agreement, Defendants sold a propeller governor to Plaintiff and installed it in the plane. (See Ex. 9, H&H Propeller Govr Work Order 23302 (Doc. 34-9) at 1; see also Ex. 12, H&H Propeller Governor Work Order 23408 (Doc. 34-12) at 1.) Even so, the language of the contract still favors a services contract, as it appears the parts were all sold in furtherance of the parties' goal to ensure the plane was airworthy and ensure the plane could pass its inspection, all as a result, primarily, of the services provided.

## 2.   **The Nature of Defendants' Businesses**

The second factor—the nature of Defendants' businesses—is not dispositive of whether the parties' agreement deals predominantly with goods or services. Defendant H&H Propeller Service, Inc. "is in the business of selling and servicing airplane propellers, and in some instances selling and servicing

propeller governors," which suggests that sale of goods is part of its business. (Defs.' Answer (Doc. 17) at 2.) In contrast, on its official estimates and invoices, Defendant Triad Aviation, Inc. is listed as an "FAA Certified Repair Station," which suggests that its main area of work is servicing planes, not selling goods. (See, e.g., Ex. B, Pl.'s Aff. (Doc. 43) at 7.) Further, Defendants collectively describe their businesses as "companies engaged in the maintenance of aircraft," (Defs.' Summ. J. Br. (Doc. 34) at 2), again suggesting a contract for services.

Thus, it is unclear from the nature of Defendants' businesses whether the agreement was predominantly for the sale of goods or the performance of services. On the evidence provided, this court finds that this second factor does not support a finding of either a goods or a services contract.

### 3. <u>Intrinsic Worth of the Materials Involved</u>

The third factor—the intrinsic worth of the materials involved—supports finding that the parties' agreement was for services, not for sale of goods. In transactions for vehicle repairs, when evaluating this factor, courts have compared charges for labor versus charges for parts. See <u>N.C. Farm Bureau Mut. Ins.</u>, 2021 WL 633646, at *12 (finding that the third factor concerning the intrinsic worth of the materials involved favored

a contract for the sale of goods when replacement parts provided by an auto shop cost $7,987.40 while labor cost $4,500).

The service work resulted in a total charge to Plaintiff of $104,298.88. (See Ex. B, Pl.'s Aff. (Doc. 43) at 12.) Hangar costs were $27,872.20. (See id.) The engine overhaul charges were $69,951.05, with $43,840.00 for labor, $18,960 for parts, $5,500.00 for the crankcase, and $1,651.01 for tax. (See Ex. 11, July 8, 2019 Work Order (Doc. 34-11) at 1.) Purchasing the overhauled governor from Aircraft Accessories of Oklahoma cost $2,775.35, as well as $50.35 for freight. (See Ex. 9, H&H Propeller Govr Work Order 23302 (Doc. 34-9) at 1.) The propeller overhaul cost $3,579.01, with $1,467.00 for labor, $1,977.01 for parts, and $135 for materials. (See Ex. 12, H&H Propeller Governor Work Order 23408 (Doc. 34-12) at 1.) Finally, refueling the plane cost $121.27. (See Ex. B, Pl.'s Aff. (Doc. 43) at 12.) Excluding hangar costs, refueling costs, taxes, and freight, Plaintiff paid $45,307 in total for labor and $29,162.01 in

total for parts and the crankcase.[6] The cost for services exceeds the cost for parts, suggesting that the third factor weighs towards a services contract. Cf. BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1330 (11th Cir. 1998) ("[W]hen . . . the charge for goods exceeds that for services, the contract is more likely to be for goods.").

There is no material dispute as to the facts concerning the relevant language of the contract, the nature of Defendants' businesses, or the intrinsic worth of the materials involved; instead, the parties dispute the legal conclusions to be drawn from these facts. Here, the three factors considered together suggest the predominant purpose of the parties' agreement was for services, not for sale of goods. The first and third factors directly weigh in favor of finding that services were the

---

[6] In North Carolina Farm Bureau Mut. Ins., the court only considered the value of replacement parts versus the value of labor in determining the intrinsic value of the materials involved. N.C. Farm Bureau Mut. Ins., 2021 WL 633646, at *12. As a result, this court only considers Defendants' invoice line items that are clearly labeled as labor or parts when evaluating the third factor. However, even if this court considered hangar costs and refueling costs, this court's finding that the third factor weighs towards a services contract does not change. This is because providing hangar space would likely be considered a service, while fuel and materials would be goods. When considering labor, parts, hangar costs, fuel, and materials (and only excluding taxes and freight), Plaintiff paid $73,179.20 for services and $29,418.28 for goods. Here again, the cost for services exceeds the cost for parts, suggesting that the third factor still weighs towards a services contract.

predominant purpose of the parties' transaction. The second factor does not clearly suggest that the agreement was solely for the sale of goods or services, but one factor alone is not dispositive. See N.C. Farm Bureau Mut. Ins. Co., 2021 WL 633646, at *12. Thus, because the predominant purpose for the contract was provision of services, this court finds that the contract at issue is a services contract not governed by the UCC. As the implied warranty of merchantability only applies for contracts for the sale of goods governed by the UCC, see N.C. Gen. Stat. § 25-2-314, it does not apply to the parties' transaction. This court will grant summary judgment in favor of Defendants on Plaintiff's claim under the implied warranty of merchantability.

## C. **Negligent Repairs**

Plaintiff's second claim is for negligent repairs, (see First Am. Compl. (Doc. 15) at 7–8), but Plaintiff also advances this claim under a theory of negligence per se, (see Pl.'s Summ. J. Opp. Br. (Doc. 41) at 17–21). Plaintiff explains that "Defendants owed a duty to the Plaintiff to conduct the engine and propeller overhaul and the annual inspection of his aircraft in a reasonable and prudent manner." (First Am. Compl. (Doc. 15) at 8.) He alleges that "Defendants breached their duty to the Plaintiff by failing to ensure the plane was airworthy in that the Piper Malibu experienced a propeller overspeed less than

three hours after the Plaintiff picked up the aircraft from the Defendants' possession." (Id.) Plaintiff further argues that "Defendants were per se negligent in the way they completed the subject overhaul in that they simply failed up uphold the obligations imposed under the Federal Aviation Regulations." (Pl.'s Summ. J. Opp. Br. (Doc. 41) at 19 (emphasis in original).)

Defendants argue that summary judgment in their favor is appropriate on Plaintiff's negligence claim because Plaintiff's claim is "precluded as a matter of law under the economic loss doctrine, as Plaintiff claims Breach of Contract against Defendants." (Defs.' Summ. J. Br. (Doc. 34) at 13.) They further explain that "Plaintiff's damages are confined to those arising from property damage to the aircraft itself. Accordingly, Plaintiff may not recover against Defendants in tort . . . ." (Id. at 14 (internal citations omitted).)

This court finds that Plaintiff's negligence claim is not an independent tort from his breach of contract claim such that Plaintiff may bring both contract and tort claims. Thus, this court will grant summary judgment in favor of Defendants on Plaintiff's negligence claim.

"In North Carolina, the economic loss rule 'generally bars recovery in tort for damages arising out of a breach of

- 38 -

contract.'" Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 505 F. Supp. 3d 570, 592 (M.D.N.C. 2020) (quoting Rountree v. Chowan Cty., 252 N.C. App. 155, 159, 796 S.E.2d 827, 830 (2017)). Courts must "limit plaintiffs' tort claims to only those which are identifiable and distinct from the primary breach of contract claim." Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 159, 164 (4th Cir. 2018) (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998)). Accordingly, "an action in tort must be grounded on violation of a distinct duty to the plaintiff and 'not a violation of a duty arising purely from the contractual relationship of the parties.'" Babb v. Wade Hampton Golf Club, Inc., No. 21-cv-333, 2022 WL 2760238, at *2 (W.D.N.C. Jul. 14, 2022) (quoting Rountree, 252 N.C. App. at 160, 796 S.E.2d at 831). The Fourth Circuit distinguishes an independent tort from a preexisting contractual duty: "[w]e think it unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 333 (4th Cir. 1994).

Case 1:20-cv-00612-WO-JLW   Document 80   Filed 12/27/22   Page 39 of 59

Here, Plaintiff's negligence claim is not a tort independent of his breach of contract claim. The parties' dispute centers around Defendants' alleged "fail[ure] to ensure [Plaintiff's] plane was airworthy." (Compare First Am. Compl. (Doc. 15) at 8 (alleging Plaintiff's negligence claim) with id. at 8-9 (alleging Plaintiff's breach of contract claim as the "failure of the Triad Defendants in conducting the engine and propeller overhaul in a workmanlike manner . . . resulting in and causing the propeller overspeed"). Plaintiff bargained his plane's service work in exchange for over $100,000. (See Ex. B, Pl.'s Aff. (Doc. 43) at 12.) Thus, Plaintiff's claim for negligent repairs arises under Defendants' obligations to perform plane repairs as set forth in the parties' agreement.

To identify a distinct independent tort separate from his breach of contract claim, Plaintiff posits a negligence per se theory on the grounds that Defendants failed to comply with Federal Aviation Regulations ("FARs"):

> Defendants are subject to strict Federal Aviation Regulations, which dictate who and in what manner maintenance can be performed on an aircraft. . . . Defendants were under the extra-contractual obligations imposed by Federal Aviation Regulations to conduct the subject overhaul in accordance with the Continental Manuals, and to conduct the subject annual inspection in accordance with Part 43. Here, Defendants failed on both accounts. . . . [This failure] resulted in Defendants improperly certifying Plaintiff's aircraft as airworthy and returning it to service before all required post-overhaul tests were

> completed. Not only was this a technical violation of
> the Federal Aviation Regulations, but the effects of
> these corner-cutting failures were clearly
> demonstrated by the extreme number of problems still
> plaguing the aircraft when Fredeking arrived to pick
> it up in August 2019.

(Pl.'s Summ. J. Opp. Br. (Doc. 41) at 18–20 (emphasis in original) (internal citations omitted).) However, Defendants' duties to Plaintiff under the FARs are still encompassed by their duties under the contract because Defendants suggest that they comply with the relevant air safety regulations when performing their service work. (See, e.g., Ex. 3, Estimate for Continental TSIO-550-C (Doc. 34-3) at 1 ("All of our engines are overhauled to factory new limits. All A.D. Notes will be complied with at the time of the overhaul. Any parts necessary for A.D. or S.B. compliance will be an additional charge."); Ex. 4, Removal and Reinstallation Estimate (Doc. 34-4) at 1 (describing Defendant Triad Aviation, Inc. as an "FAA Certified Repair Station").)

Noncompliance with a regulation does not necessarily constitute an independent tort as an exception to the economic loss rule. See Strum, 15 F.3d at 332. For example, in Strum, the plaintiff argued that the defendant "did not follow various North Carolina Department of Environment, Health, and Natural Resources ("DEHNR") reporting requirements . . . ." Id. He argued that violating the DEHNR regulations constituted gross

- 41 -

negligence. See id. The Fourth Circuit was "not persuaded"—explaining that "any sanction for noncompliance with DEHNR regulations most appropriately lies with that agency . . . ." Id. Ultimately, the Fourth Circuit found that the plaintiff's claim "really arises out of [the defendant's] performance on the contract, not out of the type of distinct circumstances necessary to allege an independent tort." Id. at 332-33. The Fourth Circuit affirmed the grant of summary judgment for the defendant. Id. at 333.

Although the Strum plaintiff was arguing gross negligence, not negligence per se, the same principles apply here because the Fourth Circuit's reasoning was not focused on the specific theory of negligence the plaintiff advanced, but rather, on the duties imposed by the parties' agreement compared to the duties imposed under tort law. See id. at 332-33. Here, Defendants' contractual duties were to overhaul Plaintiff's plane, repair the plane to ensure it was airworthy, and conduct an annual inspection—all pursuant to the FARs. The regulations did not result in additional and independent duties, but merely governed how Defendants performed their contractual duties.

Thus, the economic loss rule bars Plaintiff's negligence claim. This court will grant summary judgment in favor of Defendants on Plaintiff's second claim for negligent repairs.

- 42 -

### D. **Breach of Contract**

Plaintiff's final claim is for breach of contract. (See First Am. Compl. (Doc. 15) at 8-9.) Defendants assert that Plaintiff has not provided any evidence to support a breach of contract claim. (See Defs.' Summ. J. Br. (Doc. 34) at 17-19.) Defendants argue that Plaintiff's expert testimony is inadmissible and that Plaintiff's claim "rests entirely on Mr. Sleeman's unfounded opinion that the propeller and engine overspeeds were most likely due to contamination, and that a phantom particle caused the propeller governor to stick, resulting in the overspeeds." (Id. at 18.) They further argue that "Mr. Sleeman has never identified any particular work by Defendants that caused the supposed contamination." (Id. at 19.) Ultimately, Defendants' argument is based on causation—that Plaintiff has not shown evidence that Defendants' work caused the alleged overspeed events, so there is no breach of contract.

Plaintiff argues that Defendants have breached multiple terms of the contract: (1) Defendants failed to complete their work in six weeks when they took five months to complete the service work, (see Pl.'s Summ. J. Opp. Br. (Doc. 41) at 21-22); (2) Defendants failed to overhaul the plane engine to "factory-new limits" when the plane experienced multiple overspeeds during the fourth test flight, (see id. at 22); (3) Defendants

- 43 -

failed to properly conduct an annual inspection when they failed to identify the contaminated oil that caused the overspeed events, (see id.); and (4) Defendants failed to honor the terms of their warranty when they required Plaintiff to bring the plane back to Defendants' facility in North Carolina for them to conduct any repairs following the overspeed event, (see id.).

Under North Carolina law, "[i]nterpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). "It must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." Hartford Accident & Indem. Co. v. Hood, 226 N.C. 706, 710, 40 S.E.2d 198, 201 (1946) (internal citation omitted). "When the language of a contract is plain and unambiguous[,] then construction of the agreement is a matter of law for the court." Whirlpool Corp. v. Dailey Constr., Inc., 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993).

If, however, the language of a contract "is ambiguous and the intention of the parties is unclear, interpretation of the contract is for the [finder of fact]," and summary judgment is not appropriate. Glover v. First Union Nat'l Bank of N.C., 109

- 44 -

N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). A contract is ambiguous "when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004). In determining whether a contract is ambiguous, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible." Piedmont Bank and Tr. Co. v. Stevenson, 79 N.C. App. 236, 241, 339 S.E.2d 49, 52 (1986).

The elements of a North Carolina breach of contract claim are "(1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). The parties do not dispute a valid contract existed; rather, the parties dispute whether Defendant breached the contract. This court finds that there are genuine issues of material fact as to whether any overspeed events occurred, whether Defendants' work caused the alleged overspeed events, and whether Defendants failed to honor their warranty. Accordingly, this court will deny summary judgment on Plaintiff's claim for breach of contract.

### 1. Overview of the Parties' Agreement

Before analyzing the parties' arguments regarding breach of contract, this court will first provide a brief overview of the

- 45 -

undisputed facts and legal implications of the parties'
agreement.

Defendants sent Plaintiff an email estimate for an engine
overhaul on January 2, 2019. (See Ex. 3, Estimate for
Continental TSIO-55-C (Doc. 34-3) at 1.) This estimate quoted an
engine overhaul price of $62,800; the price included "the
magnetos, harness, spark plugs, starter, fuel injection system,
turbocharger, controller, waste gate, and new cylinders." (Id.)
It further stated that Defendants would notify Plaintiff "of any
additional charges exceeding $200.00 prior to proceeding" with
those repairs. (Id.) Finally, it stated that Defendants'
"warranty is 500 hours or one year, and then pro-rated to TBO on
parts. Warranties on accessories are as provided by the
supplier." (Id.)

Also on January 2, 2019, Defendants sent Plaintiff an email
estimate for removal and reinstallation of the engine for
purposes of overhauling the engine. (See Ex. 4, Removal and
Reinstallation Estimate (Doc. 34-4) at 1.) This estimate quoted
a removal and reinstallation price of $5,500, as well as an
engine mount replacement price of $1,200. (See id.) It also
noted that the estimated price did "not include any additional
discrepancies" identified later; those discrepancies could
result in additional charges, as the estimate was "subject to

- 46 -

revision." (See id.) For example, the estimate stated that "[c]rankcase and crankshaft repair or replacement is not included, and will require extra time and cost if required." (Id. (emphasis omitted).) Again, it stated that Defendants would notify Plaintiff "of any additional charges directly applicable to the engine overhaul which exceed $200.00 prior to proceeding." (Id.) The engine removal and reinstallation estimate included the same warranty language as the engine overhaul estimate: "You will be pleased to know that our engine warranty is 500 hours or one year, and then pro-rated to TBO on parts." (Id.)

On March 11, 2019, when Plaintiff delivered his plane to Defendants' facility, Plaintiff signed a "work authorization form" that detailed the services Defendants were to provide. (See Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1; see Ex. B, Pl.'s Aff. (Doc. 43) at 2.) The work authorization form listed the following services: (1) engine overhaul; (2) propeller and governor overhaul; (3) annual inspection; (4) magnaflux engine mount; (5) checking the aircraft for corrosion; and (6) checking the seal between the propeller and engine for leaks. (See Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1–2.)

These three documents summarize the parties' initial agreement as to the services Defendants were providing

- 47 -

Plaintiff. See Croom v. Goldsboro Lumber Co., 182 N.C. 217, 220, 108 S.E. 735, 737 (1921) (holding that there must be a meeting of the minds for a contract to form). The two estimates provided on January 2, 2019, (see Ex. 3, Estimate for Continental TSIO-550-C (Doc. 34-3) at 1; see Ex. 4, Removal and Reinstallation Estimate (Doc. 34-4) at 1), specify the price for Defendants' services. See Shelton v. Duke Univ. Health Sys., 179 N.C. App. 120, 123, 633 S.E.2d 113, 115 (2006) (explaining that a contract must have a definite price term). The March 11, 2019 work authorization form is definite as to the services Defendants were to provide in accordance with the parties' agreement because it listed all the services Defendants would provide, as well as Defendants' warranty. See Elks v. North State Life Ins., 159 N.C. 619, 626, 75 S.E. 808, 811 (1912) (explaining that an offer's terms must be sufficiently definite, not just an invitation to deal). Plaintiff's signature on the work authorization form shows Plaintiff's assent to the agreement. See Mosely v. WAM, Inc., 167 N.C. App. 594, 599, 606 S.E.2d 140, 143 (2004) (explaining that a signature constitutes assent to a contract).

On April 25, 2019, Defendants emailed Plaintiff to inform him that "[t]he engine inspection [was] complete" and to request Plaintiff's authorization for additional repairs. (See Ex. 8,

- 48 -

April 25, 2019 Email (Doc. 34-8) at 1.) These additional repairs constitute a modification of the parties' original agreement, as the email lists new services to be performed for an additional charge. (See id.) The additional charge for each additional repair serves as consideration for the contract modification. See Brenner v. Little Red School House, Ltd., 302 N.C. 207, 215, 274 S.E.2d 206, 212 (1981) ("Where . . . a contract has been partially performed, an agreement to alter its terms is treated as any other contract and must be supported by consideration.")

Based on the evidence presented, this court finds that these four documents comprise the parties' agreement regarding the service work to be performed on Plaintiff's plane.[7]

## 2. **Completing the Service Work in Six Weeks was not a Term of the Contract.**

Plaintiff asserts that the parties agreed that Defendants' service work would be completed within six weeks based on Defendants' email on February 4, 2019, stating that Defendants were "still around 6+ weeks on engine overhauls, but [they] hope

---

[7] Defendants' work orders, (see Ex. 9, H&H Propeller Govr Work Order 23302 (Doc. 34-9); Ex. 11, July 8, 2019 Work Order (Doc. 34-11); Ex. 12, H&H Propeller Governor Work Order 23408 (Doc. 34-12)), provide clarification on the price term of the parties' agreement because they provide a detailed breakdown of the charges to Plaintiff. However, they do not constitute new or additional agreements.

that number will be lower by the time [Plaintiff's] aircraft arrives." (Ex. B, Pl.'s Aff. (Doc. 43) at 8.)

North Carolina's rules of contract interpretation require an agreement to be construed as a whole and to determine the intent of the parties "from the entire instrument and not from detached portions. Individual clauses are to be considered in context. All parts of the contract will be given effect if possible." Int'l Paper Co. v. Corporex Constructors, Inc., 96 N.C. App. 312, 316, 385 S.E.2d 553, 555-56 (1989) (internal citation omitted). A contract is ambiguous if "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Register, 358 N.C. at 695, 599 S.E.2d at 553. When a court is asked to interpret an ambiguous contract, summary judgment is not appropriate. Glover, 109 N.C. App. at 456, 428 S.E.2d at 209.

After consideration of the entirety of the communications between the parties leading to the work authorization form Plaintiff signed on March 11, 2019, this court finds that a six-week deadline was not a term of the contract. (See Ex. B, Pl.'s Aff. (Doc. 43) at 8; see Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1-2.) Material contract terms require mutuality of assent. See Normile v. Miller, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) ("[A]ssent. . . requires an offer and acceptance in the

exact terms . . . .") "[W]hen no time is specified in a contract for the performance of an act or the doing of a thing, the law implies that it may be done or performed within a reasonable time."[8] <u>Winders v. Hill</u>, 141 N.C. 694, 704, 54 S.E. 440, 444 (1906).

The work authorization form lists the service work Plaintiff authorized, Plaintiff's contact information, and Plaintiff's plane details. (<u>See</u> Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1–2.) Plaintiff signed the work authorization form. (<u>See</u> <u>id.</u> at 1.) It does not include any deadlines or any language suggesting that time was of the essence. (<u>See</u> <u>id.</u>) Further, Defendants' February 4, 2019 email is merely an estimate, not an agreed-upon deadline. Without mutual assent, Plaintiff's asserted six-week deadline for Defendants' performance is not a term of the parties' agreement. This court concludes that there are no disputed issues of fact as to whether the contract required completion within six weeks.

---

[8] Defendants do not argue that, in the alternative, completion of the service work within five months was performance within a reasonable time. Similarly, Plaintiff does not argue that five months was an unreasonable delay. Thus, this court will not address whether Defendants' performance occurred within a reasonable time or whether Defendants' five-month timeline for performance constitutes breach.

Thus, this court finds that Defendants did not breach the contract by completing the service work in six weeks.[9]

### 3. There are Genuine Disputes of Material Fact on Whether Any Overspeed Events Occurred and on Whether Defendants' Service Work Caused the Alleged Overspeed Events.

Plaintiff argues that Defendants breached the contract due to the overspeed events for two reasons. First, the occurrence of the overspeed events means that Defendants failed to properly overhaul the plane engine. (See Pl.'s Summ. J. Opp. Br. (Doc. 41) at 22.) Second, the presence of contaminated oil that Plaintiff asserts caused the overspeed events means that Defendants did not properly conduct an annual inspection. (See id.)

The parties dispute whether the overspeed events occurred. (Compare Defs.' Summ. J. Br. (Doc. 34) at 1 ("Defendants assert there is no corroborative evidence to Plaintiff's self-serving

---

[9] Even assuming, arguendo, that the contract required completion within six weeks, there does not appear to be any dispute of fact that the initial work was solely for engine overhaul, propeller and governor overhaul, and an annual inspection. (See Ex. 6, Mar. 11, 2019 Work AZ (Doc. 34-6) at 1–2.) Further, there does not appear to be any dispute that additional work was required. (See Ex. 8, April 25, 2019 Email (Doc. 34-8) at 1.) Any alleged contract provision of a six-week deadline would be limited solely to the work agreed-upon initially and listed in the March 11, 2019 work authorization form, not any additional work found to be necessary later.

- 52 -

statement that a propeller overspeed occurred."), with Pl.'s
Summ. J. Opp. Br. (Doc. 41) at 2 ("[Defendants] failures also
resulted in the overspeed events . . . .").)[10]

The parties also dispute whether Defendants caused the
alleged overspeed events and whether there was any contaminated
oil that may have caused the alleged overspeed events. (Compare
Defs.' Summ. J. Br. (Doc. 34) at 1 ("Even if an overspeed
occurred, which is denied, Plaintiff has failed to present any
credible evidence that Defendants' work caused it."), and Ex.
26, Handley Am. Report (Doc. 34-26) at 5 ("[N]o physical
evidence has been discovered to identify any source of the
alleged propeller overspeed . . . . I can find nothing
specifically done by Triad Aviation, Inc., that would have
caused a propeller overspeed condition."), with Pl.' Summ. J.
Opp. Br. (Doc. 41) at 2 (Defendants "failed in the most simple
and commonly understood engine maintenance task of ensuring that
the newly overhauled engine was filled with clean and
uncontaminated oil. This final and ultimate failure caused the
aircraft's engine to sustain multiple fatal overspeed
events . . . ."), and Douglas Sleeman Investigation Report

_____

[10] Plaintiff's statement may or may not be self-serving.
Regardless, it is direct evidence of an overspeed event, whether
corroborated or not. The jury will decide the weight to be
assigned to the statement.

(Doc. 44-4) at 7 ("[T]he probable cause of the engine and propeller overspeeds were due to a malfunction of the propeller governor, most likely due to contamination.").)

"[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. 242 at 248. If "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is not appropriate. Id. at 250. Here, "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. Thus, the existence of genuine disputes of material fact on the occurrence and cause of the overspeed events precludes summary judgment.

### 4. Defendants' Warranty Appears to be a Modification of the Parties' Agreement.

Finally, Plaintiff argues that Defendants breached the contract by failing to honor their warranty when they required Plaintiff to bring the plane back to Defendants' facility in North Carolina to conduct any repairs following the overspeed events. (See Pl.'s Summ. J. Opp. Br. (Doc. 41) at 22.) Defendants argue that "Plaintiff's assertion is disingenuous as Plaintiff prevented Defendants from honoring the Warranty terms by preventing Defendants from examining the engine to determine

if it was defective in materials or workmanship and then disposing of it." (Defs.' Reply (Doc. 49) at 7–8.)

Defendants initially represented their warranty as "500 hours or one year, and then pro-rated to TBO on parts" in their estimate for engine removal, overhaul, and re-installation services. (Ex. B, Pl.'s Aff. (Doc. 43) at 6; id. at 7.) Nowhere in these communications did they state that customers must return the plane to Defendants' facility to receive repairs pursuant to the warranty. (See id.) Similarly, these communications did not state that a full warranty will be provided later or that this representation was not the full warranty. (See id.)

On August 13, 2019, after completion of the service work when Plaintiff arrived at Defendants' facility in Burlington, North Carolina to pick up his plane, he received a full copy of Defendants' express warranty. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 13.) This express warranty provided that:

> TRIAD will repair or replace on an exchange basis any engine or part supplied which within the applicable one (1) year or 500 hour period is returned to TRIAD and which upon examination is found to be defective in materials and workmanship.

(Ex. 14, Warranty (Doc. 34-14) at 1 (emphasis added).) It appears that this express warranty is the first time Plaintiff was informed that Defendants' warranty required Plaintiff to

- 55 -

return the plane or any parts to Defendants' facility in North Carolina to receive the benefits of their warranty. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42) at 5; see also Pl.'s Summ. J. Opp. Br. (Doc. 41) at 11 ("According to Fredeking, the response from Defendants was there was absolutely no way they would replace they engine they overhauled, and they would also only perform any needed repairs to the engine if Fredeking brought the plane back to Burlington, NC.").)

Here, the original warranty term provided to Plaintiff in the parties' emails and estimates served as a term of their full agreement. When Plaintiff arrived at Defendants' facility in North Carolina, he had fully paid for the service work, (see Ex. B, Pl.'s Aff. (Doc. 43) at 3); thus, he had fully performed on his obligations to the agreement. By providing a lengthier warranty statement disclaiming their prior warranty and requiring engines or parts to be returned to Defendants, it

appears that Defendants sought to modify the original contract.[11]
A modification to the terms of a contract must be supported by
consideration. See Brenner, 302 N.C. at 215, 274 S.E.2d at 212
("Where . . . a contract has been partially performed, an
agreement to alter its terms is treated as any other contract
and must be supported by consideration."). Thus, summary
judgment is not appropriate for breach of contract regarding
Defendants' failure to honor their warranty.

---

[11] The parties have not provided extensive arguments on
whether the August 19, 2019 warranty is a modification to the
original service agreement. Plaintiff states: "Defendants
attempted to deny Fredeking the benefit of the bargained for
warranty contained within the contract by attempting to hold
Fredeking to an unconscionable and impracticable warranty that
was not even provided until after the work was completed."
(Pl.'s Summ. J. Opp. Br. (Doc. 41) at 22.) In their reply,
Defendants focus on the assertion that the August 19, 2019
warranty was "unconscionable and impracticable." (Defs.' Reply
(Doc. 49) at 7.) However, without further argument, this court
cannot fully consider whether the warranty was actually
"unconscionable or impracticable."

Defendants further argue that Plaintiff prevented
Defendants from honoring the warranty "by preventing Defendants
from examining the engine . . . ." (Id. at 7-8.) However, it
appears that Defendants refused to honor their original warranty
provided on January 2, 2019 even before the issue of inspecting
the engine for purposes of litigation arose. When Plaintiff
originally contacted Othman Rashed, one of Defendants'
employees, about the overspeed event, Plaintiff testified that
Mr. Rashed required Plaintiff to return the plane or engine back
to Defendants' facility in North Carolina for Defendants to
perform any repairs. (See Pl.'s Excerpts of Pl.'s Dep. (Doc. 42)
at 5.) Thus, Defendants' statement that Plaintiff did not allow
them to honor the warranty is not convincing.

In sum, there remain genuine issues of material fact related to whether any overspeed events occurred, whether those overspeed events were caused by Defendants' service work, whether the service work breached the contract, and whether Defendants attempted to modify their warranty without consideration; these issues preclude summary judgment on Plaintiff's third claim for breach of contract.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Plaintiff's expert testimony, (Doc. 37), will be denied. Defendants' motion for summary judgment will be granted in part and denied in part. Summary judgment will be granted on Plaintiff's claim for breach of the implied warranty of merchantability because this court finds that the UCC does not govern the parties' agreement. Additionally, summary judgment will be granted on Plaintiff's claim for negligent repairs pursuant to North Carolina's economic loss rule. Finally, summary judgment will be denied on Plaintiff's claim for breach of contract because this court finds that there are genuine issues of material fact as to whether any overspeed events occurred, whether Defendants' service work caused the alleged overspeed events, and whether Defendants failed to honor their warranty.

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion to Exclude and/or Limit Plaintiff's Expert Testimony, (Doc. 37), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 33), is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as to Plaintiff's first claim for breach of the implied warranty of merchantability and Plaintiff's second claim for negligent repairs. The motion for summary judgment is **DENIED** as to Plaintiff's third claim for breach of contract.

This the 27th day of December, 2022.

_____
United States District Judge